UNITED MINE WORKERS OF
AMERICA 1974 PENSION
TRUST, et al., Plaintiffs,

v.

The PITTSTON COMPANY,
et al., Defendants.

UNITED MINE WORKERS OF
AMERICA 1974 PENSION
TRUST, et al., Plaintiffs,

v.

RAWL SALES AND PROCESSING
CO., Defendant.

Civ. A. Nos. 88–969 and 91–3241.
MDL No. 886.

United States District Court,
District of Columbia.

April 29, 1992.

Julia Penny Clark, Washington, D.C., for the Trusts.

John Martin Wood, Reed, Smith, Shaw & McClay, Washington, D.C., for Pittston.

David H. Battaglia, Greg Robertson, Hunton & Williams, Washington, D.C., for Rawls.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Before the Court are two related motions: a Motion for Reconsideration of this Court's January 31, 1992 Memorandum Opinion granting summary judgment for the plaintiffs, filed by Rawl Sales and Processing Co. (Rawl);[1] and a Motion for Amendment of this Court's January 31, 1992 Order, filed by the Pittston Company, et al., (Pittston). For the reasons that follow, this Court shall deny Rawl's motion, grant Pittston's motion in part, and certify the issues raised in the January 31, 1992 Memorandum Opinion, 782 F.Supp. 658, for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## BACKGROUND

On January 31, 1992, this Court issued a Memorandum Opinion and Order granting summary judgment for the plaintiffs, the United Mine Workers of America (UMWA) Pension and Benefit Trusts (collectively referred to as the Trusts), in Civil Action Nos. 88–969 (*Pittston*), 91–3241 (*Rawl*) and two other related cases.[2] In that Opinion, the Court held that the "evergreen clause" or "continuing contributions clause" found in the UMWA 1950 Benefit Plan and Trust (the 1950 Benefit Trust), the UMWA 1950 Pension Trust (the 1950 Pension Trust), the UMWA 1974 Pension Trust (the 1974 Pension Trust), and the 1974 Benefit Plan and Trust (the 1974 Benefit Trust), was intended to create a continuing obligation to contribute to the Trusts for those employers who elected to participate in the Trusts.[3] The Court held that this continuing obligation extended beyond the expiration of the terms of the collective bargaining agreements in which the defendant employers had elected to participate in the Trusts. In accordance with this holding, the Court ordered the defendant employers, including Rawl and Pittston, to make all of the delinquent contributions into the Trusts in which they have participated, as required by the National Bituminous Coal Wage Agreement (NBCWA) of 1988.

The Court reached its conclusion based on the voluminous briefs of all of the parties and of the *amicus curiae*, as well as on oral argument. Because the Court held that the language of the evergreen clause was susceptible to different interpreta-

---

1. This motion is joined by The Pittston Company, et al.

2. The *Rawl* and *Pittston* cases are two of six related cases pending in this Court. Two of the cases, *UMWA 1950 Benefit Plan and Trust, et al. v. Pittsburg & Midway Coal Mining Co.*, No. 88–3716, and *Pierce, et al. v. UMWA 1950 Benefit Plan and Trust, et al.*, No. 89–2833, entered into a settlement and a stipulation of dismissal after this Court issued its Memorandum Opinion. The other two cases, *UMWA 1974 Pension Trust, et al. v. A & E Coal Co. Inc., et al.*, No. 88–1126, and *UMWA 1974 Pension Trust, et al. v. Aloe Coal Company, et al.*, No. 91–207 are still pending before this Court and were not a part of this Court's January 31, 1992 Memorandum Opinion.

The *Rawl* case was transferred to this Court on December 18, 1991 by the Judicial Panel on Multidistrict Litigation. It had originally been filed in the Southern District of West Virginia and, at the time of the transfer, cross motions for summary judgment had been fully briefed and argued before Judge Robert J. Staker of that district. This Court fully considered the briefs in the *Rawl* case and the transcript of the oral argument before Judge Staker before rendering its January 31, 1992 Memorandum Opinion.

3. The evergreen clause was negotiated by the Bituminous Coal Operators' Association (BCOA) and the UMWA in 1978 and was added to the Trust language at that time. It provided that those employers who elected to participate in the Trusts were obligated to make contributions based on the rates set forth in the 1978 National Bituminous Coal Wage Agreement, and successor agreements thereto.

tions, the Court considered extrinsic evidence of the intent of the clause.[4] The Court then determined that the unrebutted evidence submitted by the Trusts regarding the negotiating history of the clause showed that the clause was intended to create a continuing obligation. No party argued to the Court that summary judgment was inappropriate due to the existence of genuine issues of material fact.

## DISCUSSION

### A. *Motion for Reconsideration*

Rawl asserts four separate grounds for its Motion for Reconsideration: (1) its "right" to conduct discovery; (2) the existence of genuine issues of material fact; (3) the existence of affirmative defenses that it needs to explore through discovery; and (4) the collateral estoppel effect of the *Island Creek* cases decided by Judge Harris of this Court and currently on appeal. *See Connors v. Island Creek Corp., et al.*, No. 87–1212, and *Connors v. Drummond Coal Co., et al.*, No. 87–1973 (D.D.C. Jan. 17, 1991).

#### 1. Rawl's "Right" to Conduct Discovery

■ Rawl's most heated argument is premised on its asserted "right" to conduct discovery into the negotiating history of the evergreen clause. Rawl claims that when this case was originally brought by the Trusts in West Virginia, the parties and the Court agreed that, in order to avoid protracted discovery that would interfere with the company's upcoming collective bargaining negotiations, the parties would file cross motions for summary judgment before embarking on any discovery. Rawl asserts that it specifically reserved its "right" to conduct discovery if the Court concluded that it was necessary to resort to extrinsic evidence. The transcript of a telephone status conference with Judge Staker in West Virginia does not indicate that

Rawl ever requested a reservation of its right to conduct discovery or that Judge Staker granted such a request. The transcript reveals only that the parties and the Court agreed that discovery would be stayed pending the Court's ruling on cross motions for summary judgment. The Order entered following the telephone status conference provided that:

> The parties have agreed that discovery shall not be initiated in this case pending the Court's decision on the Motions for Summary Judgment, except upon agreement of the parties or order of this Court for good cause shown.

Exhibit A to Declaration of Jeremiah Collins, submitted as Attachment 1 to the Trusts' Opposition to Rawl's Motion for Reconsideration. Although Rawl never moved the Court to permit it to engage in discovery, it did attempt to reserve its right to discovery in a footnote to its reply brief regarding the cross motions for summary judgment.

Because this Court's Memorandum Opinion explicitly relies on extrinsic evidence, Rawl argues that it should have been permitted to engage in discovery before this Court rendered its Opinion. Rawl argues that, if permitted, it would have deposed the various people who gave declarations on behalf of the Trusts and challenged their credibility.

Despite what Rawl argues that it would do *now*, if given the opportunity, the fact remains that Rawl did not seek leave of the Court to conduct any depositions. Rawl was fully aware that the Court might consider extrinsic evidence because reams of it had been filed and relied upon by the Trusts in not only the *Rawl* case, but also in the other three related cases in which cross motions were pending.[5] Moreover, Rawl itself submitted extrinsic evidence in support of its motion for summary judgment and in its opposition to the Trusts'

---

4. At the time the Court issued its Memorandum Opinion, the *Pittston* case had been pending since 1988 and numerous extensions of the discovery deadlines had been sought and granted.

5. An affidavit filed by Penny Clark, counsel to the Trusts, also avers that Ms. Clark offered to make *all* of the information obtained through discovery in the cases pending before this Court available to Rawl with an appropriate protective order. Rawl declined this offer.

cross motion. In fact, Rawl submitted two three-ring binders full of such evidence.

The Court is not persuaded that Rawl's alleged inability to conduct discovery justifies granting Rawl's Motion for Reconsideration. Whatever Rawl thought its "agreement" was regarding discovery, Rawl could have filed a rule 56(f) motion, either before the West Virginia court or before this Court, if it was serious about engaging in discovery. *See* Fed.R.Civ.P. 56(f). That Rawl made the strategic decision not to file such a motion does not now justify reconsidering this Court's ruling so that Rawl may engage in belated discovery.

### 2. Genuine Issues of Material Fact
#### 1. Additional Extrinsic Evidence

■ Rawl's most compelling argument is that, based on extrinsic evidence that it has submitted with its motion for reconsideration, there are genuine issues of material fact that preclude summary judgment. Rawl has attached to its motion and supplemental memo five declarations purporting to show that it never had any knowledge of the evergreen clause and that the clause could not have the meaning the Trusts assert because such an interpretation was never communicated to the persons negotiating the collective bargaining agreements on behalf of the employers. The five persons submitting affidavits on behalf of Rawl are Arch Runyon, the vice president of administration for Rawl and the person responsible for employee benefits and labor relations; E. Morgan Massey, who in 1978 was the president of several affiliated companies that were members of the BCOA[6] and who served on the Board of Directors

of the BCOA in 1978; Melvin Triolo, the Secretary/Treasurer of the Logan Coal Operator Association (LCOA) who represented LCOA as a BCOA director during the negotiations with the UMWA over the 1978 NBCWA; Nicholas Camicia, the former chairman of the Pittston Company and one of the negotiators of the 1978 NBCWA; and Stoney Barker, Jr., who was a member of the Executive Committee of the BCOA during the 1978 negotiations. Each of these affiants states that despite his participation or involvement in the 1978 negotiations, he never was apprised of the evergreen clause—in fact never even heard of it—until the Trusts began to bring these cases in the mid to late 1980s. Although Mr. Massey was a member of the Board of Directors of the BCOA, he allegedly was never asked to ratify the clause. Similarly, although Mr. Barker was on the Executive Committee of the BCOA during the relevant negotiations, he does not recall the Executive Committee ever giving the Benefits Subcommittee the authority to negotiate a continuing contributions clause. Virtually each of the five affiants attests that he believed the obligation to contribute to the Trusts would cease with the expiration of the collective bargaining agreements.[7]

The Court's question is: why didn't Rawl submit these declarations with its opposition to the Trusts' motion for summary judgment? In that motion, the Trusts made it clear they were relying on evidence of the negotiating history of the evergreen clause to support their position. They submitted the declarations of several of the negotiators of the Trust documents. Rawl could have submitted the same declarations then that it seeks to submit today. It did

---

**6.** These companies later merged into Rawl.

**7.** By way of comparison, the Court notes that one of the declarations relied on by the Court in its Memorandum Opinion was the declaration of Roger Haynes, the chairman of the BCOA Benefits Subcommittee that negotiated the evergreen clause. Mr. Haynes averred that the evergreen clause was specifically negotiated to ensure that coal operators who voluntarily agreed to participate in the Trusts could not later walk away from their obligations at the expense of the remaining employers. *See* Mem.Op. at 665.

Additionally, the Court notes that its Memorandum Opinion relied on the congressional

testimony given by Donald Pierce, a UMWA negotiator during the 1978 negotiations, when Congress was considering the Multiemployer Pension Plan Amendments Act of 1980. Only two years after the negotiations, Pierce testified before Congress that the negotiators specifically included the evergreen clause in order to keep participating employers "in the fold" and to require them to continue contributing into the future based on contributions called for in successor agreements to the NBCWA. *See* Mem. Op. at 666.

not need discovery to obtain these declarations, which are hardly "newly discovered" evidence. Apparently, Rawl chose to ignore the extrinsic evidence and rely on its arguments about plain language and federal labor policy. Perhaps it was concerned that if it submitted declarations that conflicted with those submitted by the Trusts, the Court would hold that genuine issues of material fact precluded summary judgment. Only now, after the Court has rejected its other arguments, does Rawl seek to show that there are genuine issues of material fact by submitting extrinsic evidence that has been available to it since the inception of this litigation.[8] Such manipulation of the litigation process is not condoned by the Federal Rules of Civil Procedure or by this Court.

b. Improper Weighing of the Evidence

Also in support of its argument that summary judgment was inappropriate,

Rawl argues that the Court improperly "weighed" the evidence before it when it concluded that the evergreen clause was intended to create a binding obligation on employers. Rawl argues that, in cases involving contract interpretation, unless the contract is wholly unambiguous, its interpretation raises a genuine issue of material fact that cannot be resolved through summary judgment.

*Air Transport Ass'n of America v. Lenkin,* 899 F.2d 1265 (D.C.Cir.1990) (per curiam), sets forth the standard quite succinctly. In that case, the appellate court affirmed the district court's grant of summary judgment although the contract's language was ambiguous. The appellate court agreed with the district court "that consideration of extrinsic evidence 'emphatically supports' appellees' position." *Id.* at 1266 (citing district court opinion). It went on to state:

---

**8.** Rawl may be attempting to show more through these declarations than actually exists. None of them provide affirmative evidence of a contrary interpretation of the evergreen clause. Rather, they merely establish that several people who were in positions to know about the evergreen clause in fact did not know about the clause until the Trusts began bringing the evergreen cases. Moreover, the Trusts argue that the evergreen provision did not engender a lot of debate because it was not controversial—the negotiators were able to agree to it with little discussion.

More troubling than Rawl's "new" declarations, however, is Rawl's discovery of another case in which, after a company ceased contributing to the Trusts, the Trusts sought withdrawal liability rather than seeking to enforce the evergreen clause. Four of these cases were discussed at length in this Court's Memorandum Opinion. *See* Memorandum Opinion at 672–674. The Trusts continue to argue that this was the inadvertent result of their failure to focus on the clause until employer withdrawals began to become a problem. The case discovered by Rawl was brought by Kelley Coal against the Trusts in 1987 to contest the Trusts' assessment of withdrawal liability against the company. In that case, the Trusts took the position that Kelley had withdrawn from the Trusts in 1984 when its 1981 wage agreement providing for contributions to the 1950 Trusts expired and it did not enter into a successor agreement providing for such contributions. Kelley took the position that it had not withdrawn from the plan, but had "suspended contributions under the plan during a labor dispute involving its employees" within the meaning of ERISA. Nei-

ther party discussed or relied on the evergreen clause. The case was "administratively closed" when Kelley Coal filed a voluntary petition in bankruptcy. *See* Rawl's Motion for Reconsideration, Exhibit 4.

Also troubling is a "Q & A" on withdrawal liability that was ratified by the Trustees in August 1981. In response to the question "When does a "complete withdrawal" within the meaning of Section 4201 of ERISA occur?" the Q & A states, among other things, "where ... (c) an employer becomes non-signatory." Attachment 2 to Rawl's Supplemental Memorandum in Support of Motion for Reconsideration. This is precisely the position taken by Rawl and the other defendant employers in these cases: that their obligations ceased when they no longer were signatories to an NBCWA or "me-too" agreement incorporating the terms of the NBCWA. The Trusts' rebuttal to this evidence is the same as their rebuttal to the withdrawal liability cases: the trustees did not participate in the negotiation of the Trust language and did not focus on it until the mid to late 80s when the withdrawal of employers from the Trusts began to be a problem.

As with the declarations, the Court is concerned about Rawl's failure to submit this evidence until after it lost its motion for summary judgment. According to the Trusts, both the *Kelley* case and the Q & A had been produced in discovery to the other defendants long before summary judgment motions were filed. Rawl was given the opportunity to examine this discovery. Its failure, apparently for strategic reasons, to withhold this evidence until now has the appearance of sandbagging and gives the Court great concern.

At first glance, it might appear that a case involving an arguably ambiguous contract requiring consideration of extrinsic evidence for definitive resolution would be inappropriate for summary judgment. As this court has stated, however, in cases where extrinsic evidence is "so clear that it cannot fairly be said that the material issue of intent is genuinely in dispute," summary disposition is appropriate. *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 684 n. 23 (D.C.Cir.1985).

*Id.* at 1266–67.

In this case, the Court concluded, after reviewing the voluminous evidence submitted by the Trusts, that the only reasonable interpretation of the evergreen clause is that it was intended to create a continuing obligation to contribute. Based on what was before the Court at the time, as well as on the parties' strenuous arguments that there were no genuine issues of material fact in dispute, the Court concluded that summary judgment was appropriate. Only after the defendants lost did they begin to argue that summary judgment was inappropriate. The Court continues to stand by its original conclusion.

### 3. Rawl's Affirmative Defenses

Rawl argues that the defenses of statute of limitations and laches are available and it should be given the opportunity to conduct discovery regarding these defenses in order to present them to the Court. Rawl argues that the three-year statute of limitations applicable to contract cases is applicable to this case. It also argues that the plaintiff Trusts have unreasonably delayed bringing their claims and that this delay has prejudiced Rawl, thus barring this case based on laches. To pursue either of these defenses, Rawl argues that it will be necessary to engage in discovery.

■ Rawl has waived these affirmative defenses by not asserting them in its own motion for summary judgment and, more importantly, by not asserting them in its opposition to the Trusts' motion for summary judgment. If Rawl believed it needed discovery to assert these defenses, it should have asked for discovery rather than moving forward with its motion on the merits. *See Federal Deposit Insurance Corp. v. Simon*, 607 F.Supp. 1254, 1256 (D.C.Ill.1985) (affirmative defense raised in answer abandoned due to defendant's failure to respond to plaintiff's motion for summary judgment); *Attorney General of United States v. The Irish People, Inc.*, 595 F.Supp. 114, 120 n. 9 (D.D.C.1984) (noting that it appeared that defendant had abandoned its affirmative defenses because it did not raise them in its motion for summary judgment or cross motion to the plaintiff's motion for summary judgment), *aff'd in part and rev'd in part on other grounds*, 796 F.2d 520 (D.C.Cir.1986).

### 4. Collateral Estoppel Effect of Island Creek Cases

Rawl's fourth argument, regarding the collateral estoppel effect of Judge Harris' decision in the *Island Creek* cases, was fully analyzed in this Court's Memorandum Opinion and will not be rehashed here. Rawl has submitted no new evidence or argument requiring reconsideration of this issue.

### 5. Conclusion

Motions for reconsideration are not specifically provided for under the Federal Rules of Civil Procedure. The most analogous rule, however, is rule 60, which provides for relief from a final judgment or order. That rule states that:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)....

Fed.R.Civ.P. 60(b). This rule, by its terms, applies only to "final" judgments and orders. In this regard, the Advisory Committee Note states that:

The addition of the qualifying word "final" emphasizes the character of the

judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.

■ The Fourth and Fifth Circuits have held that a motion to reconsider an interlocutory order is not governed by rule 60(b), but is within the discretion of the trial court, subject to appellate review under the abuse of discretion standard. *See Fayetteville Investors v. Commercial Builders,* 936 F.2d 1462 (4th Cir.1991); *Xerox Corp. v. Genmoora Corp.,* 888 F.2d 345 (5th Cir. 1989). *See also* 7 Moore's Federal Practice, ¶ 60.20 ("Interlocutory orders and judgments are not within the provisions of 60(b), but are left within the plenary power of the Court that rendered them to afford such relief from them as justice requires.").

According to the Fifth Circuit, in ruling on a motion for reconsideration, a judge must "consider judicially the record as it exists at the time of the motion for reconsideration not just as it existed at the time of the initial ruling." 888 F.2d at 349. In the *Xerox* case, a shareholder derivative suit, the trial court granted the defendant's motion for summary judgment and denied plaintiff's rule 56(f) motion for a continuance to conduct discovery to rebut the affidavits submitted with the motion to dismiss. Plaintiff filed a motion for reconsideration, supported by many documentary exhibits from a related case. The trial court denied the motion for reconsideration and the Fifth Circuit reversed, stating as follows:

> Because these documents reflect the existence of genuine issues of material fact, the trial judge knew positively at that time that his earlier grant of summary judgment could no longer be justified. He could not turn his back on such an overwhelming showing. He was obliged to reconsider and rescind the interlocutory summary judgment order. Failure to do so constituted an abuse of discretion.

*Id.* at 356.

There are several facts that distinguish the *Xerox* case from the *Rawl* case. First, in *Xerox,* the plaintiff moved for a continuance in order to conduct discovery before the court ruled on the pending motion for summary judgment. In the *Rawl* case, Rawl made no such motion, even though it was obvious from the Trusts' briefs that extrinsic evidence had been submitted and relied upon. Second, in *Xerox,* the information plaintiff sought through discovery was information that could only be provided by the ex-directors of the defendant and was not in the plaintiff's possession. With its motion for reconsideration, the plaintiff was able to establish, through the submission of the ex-directors' statements in other related litigation, that discovery was necessary and was likely to produce evidence rebutting the defendants' showing. In *Rawl,* everything that Rawl has now submitted as evidence of a factual dispute has been available to Rawl all along. The affidavits submitted with its motion for reconsideration came primarily from its own employees and those of the other defendants. Rawl did not need any discovery to obtain these affidavits. The *Kelley* case and the Q & A on withdrawal liability had been produced by the Trusts well before summary judgment motions were filed. In short, none of what Rawl submits today is truly "new." Rather, it was withheld from the Court until it became useful to Rawl.

Finally, in *Xerox,* the information presented to the trial judge with the motion for reconsideration raised genuine issues of material fact with respect to the defendant directors' breach of their fiduciary duties. In the *Rawl* case, the affidavits submitted by Rawl establish only that officials of the Rawl companies were unaware of the evergreen clause; they do not establish that the evergreen clause was not intended to create a continuing obligation to contribute.[9]

9. The facts of the Fourth Circuit's opinion in *Fayetteville Investors* are so different from those in *Rawl* that they provide little guidance for this Court. In that case, the trial court denied reconsideration of a motion to dismiss primarily because the plaintiff submitted evidence without

The Court is concerned about the effect of the evidence submitted by Rawl in support of its motion for reconsideration, particularly in light of the pendency of two other cases regarding the evergreen clause. Nevertheless, the Court finds this case distinguishable from the *Xerox* case, in which the failure to present relevant evidence was not the fault of the nonmoving party. In this case, the Court can conclude nothing other than that Rawl made a decision, as part of its litigation strategy, to withhold its own evidence of negotiating history and base its entire argument for summary judgment on plain language and federal labor policy. That Rawl was somehow "denied" discovery is a red herring—Rawl did not need any discovery to come up with what it has now submitted. If Rawl's tactics are to be condoned, it will render the strictures of rule 56 meaningless. Litigants will be free to put forth only the arguments that they think will result in summary judgment in their favor. Then, if that tactic fails, they will fall back on their withheld evidence to show the existence of material facts. Rawl wants to have its cake and eat it too. The Court will not allow this. Accordingly, the Court shall deny Rawl's Motion for Reconsideration.

### B. *Motion to Amend and Certify for Interlocutory Appeal*

Pittston's Motion for Amendment seeks three things: (1) an amendment of the January 31, 1992 Memorandum Opinion and Order certifying this case for interlocutory appeal pursuant to 28 U.S.C. § 1292(b); (2) an amendment clarifying that summary judgment was not entered against Thames Development, Ltd. (Thames) and The Pittston Company (The Pittston Company is the parent of the numerous defendant coal operators, referred to in the Memorandum Opinion and herein as the PCG Companies); and (3) to dismiss the complaint against Thames and Pittston.

### 1. Motion for Interlocutory Appeal

Pittston's arguments in support of an immediate interlocutory appeal are essentially the same as those made by Rawl in support of its Motion for Reconsideration.[10] Pittston argues that: (1) it is entitled to discovery to rebut the Trusts' evidence of negotiating history; (2) there are genuine issues of material fact; and (3) the Trusts should be barred by collateral estoppel. Like Rawl, Pittston has now come up with two declarations—that have been available since the inception of this litigation—allegedly supporting its position. These declarations are made by Joseph Farrell, the current Chairman and C.E.O. of Pittston who has been with the company since 1984, and by Paul Douglas, the former Chairman and C.E.O. of Pittston from 1984 to 1991. Both state that they never knew that com-

---

explaining why that evidence had not been submitted in its opposition to the defendant's motion to dismiss. The appellate court's reversal of the trial court's denial of reconsideration was based on the fact that it is not the plaintiff's burden, in opposing a motion to dismiss under rule 12(b)(6), to come forward with all of the facts of the case. The appellate court specifically noted that the parties had acknowledged on the record that they did not seek to convert the 12(b)(6) motion into a summary judgment motion. The appellate court did not indicate whether the trial court's denial of reconsideration would have been appropriate had the motion been for summary judgment and had the plaintiff still failed to come forward with rebuttal facts and affidavits until moving for reconsideration.

Assuming that the result would have been different had the motion been for summary judgment rather than to dismiss, this Court is in full agreement with the trial court's rationale for denying reconsideration:

A party should not be permitted to use a motion to reconsider as a vehicle to introduce additional evidence which could have been adduced during the pendency of the prior motion.... Dispositive motions serve judicial economy by encouraging parties to winnow out extraneous issues. To compel their cooperation in this process, litigants face the dismissal of claims which are not adequately supported by the early and full disclosure of all material facts. This system is compromised if courts allow litigants to control the time at which evidence will be produced. 936 F.2d at 1470 (quoting the trial court's order).

10. At oral argument, counsel for Rawl represented that if its Motion for Reconsideration was denied, it joined with Pittston in seeking an interlocutory appeal.

panies who withdrew from the NBCWA would nonetheless be required to continue to contribute to the Trusts at the rates negotiated between the BCOA and the UMWA. Mr. Douglas states that, had the PCG Companies known of this obligation when they decided to withdraw from the BCOA and negotiate their own agreements with the Union, they probably would not have proceeded as they did.

■ Interlocutory review is governed by 28 U.S.C. § 1292(b), which provides, in pertinent part, that:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The Trusts argue that such a certification is for use only in exceptional cases. *See Tolson v. United States*, 732 F.2d 998, 1002 (D.C.Cir.1984). The Court does not take issue with this statement of the law; rather, the Court believes these are precisely the type of exceptional cases for which interlocutory appeal is appropriate. Among the "controlling question[s] of law as to which there [are] substantial ground[s] for difference of opinion" are: (1) whether the plain meaning of the evergreen clause should have governed the Court's decision; (2) whether the extrinsic evidence considered by the Court raised genuine issues of material fact; (3) whether federal labor law prohibits the Court's interpretation of the evergreen clause to create a continuing contribution; (4) wheth-

er the Trusts were collaterally or judicially estopped from bringing these cases under the evergreen clause; and (5) whether this Court is in error by denying Rawl's motion for reconsideration on the grounds that it strategically withheld information that was available to it at the time it filed its opposition to the Trusts' motion for summary judgment. The sheer volume of the briefs, the number of attorneys involved, and the obvious interest to the public attest to the substantial differences of opinion engendered by each of these issues. The interpretation of the evergreen clause has such far-reaching consequences for the coal industry, the Union, and federal labor law, that an expedited and final resolution of its meaning is imperative.

The Trusts and the BCOA argue vehemently that certifying this case for interlocutory appeal will not "materially advance the ultimate termination of the litigation" because all that is left is to collect the information regarding hours worked and coal produced and calculate the amount of delinquent contributions owed. The only issue for which the Trusts anticipate further briefing is the appropriate contribution rate, which is contested.

The Trusts are obviously ignoring the protracted history of this litigation in arguing that it is near a final resolution. As much paper has been filed post-summary judgment as pre-summary judgment and a discovery dispute has already arisen over collecting the information regarding hours worked and coal produced. In the Court's eyes, it is clear that these cases are still a far cry from final judgment and that, if the Court's legal conclusions on liability are not upheld, the time and money spent calculating the amount of contributions due will have been wasted.[11]

---

11. The Court is reminded of the magnitude of these cases by the pendency of two somewhat related cases before Judge Jackson of this district. These cases, which involve the "guarantee clause" of the Trusts, have been reviewed by the Court of Appeals on four occasions and still remain before the trial court. *See UMWA 1950 Benefit Plan and Trust, et al. v. BCOA*, No. 89–

1744 (D.D.C.); *UMWA 1974 Benefit Plan and Trust, et al. v. BCOA*, 90–0674, 1991 WL 131216. Additionally, a related case is currently pending in the Western District of Virginia. In that case, a class of retired miners has sought to enjoin the Trusts, pursuant to the "suspension clause," from suspending benefits under the 1974 and

For these reasons,[12] the Court will grant Pittston's motion to the extent that it seeks an amendment of the January 31, 1992 Order certifying this case for interlocutory appeal. The Court will also stay the proceedings in these and the related cases pending the outcome of the appeal. The Court encourages the parties to ask for an expedited appeal and argument because of the dire financial situation of the Trusts at this time as well as the impact any ruling will have on the related litigation and further collective bargaining between the Union and the defendants.

2. Amending the Order as to Thames and Pittston and Dismissing these Defendants

The Trusts concede that the January 31, 1992 Memorandum Opinion and Order should be amended to clarify that it does not apply to Thames and the Pittston Company (the parent companies). Neither of these companies was a signatory to the 1984 NBCWA. Thus, the Court shall amend its Order to reflect that it does not apply to either Thames or the Pittston Company. The Court shall withhold ruling on the dismissal of these defendants pending the interlocutory appeal of these cases.

## CONCLUSION

For all of the foregoing reasons, the Court shall deny Rawl's Motion for Reconsideration and shall grant in part Pittston's Motion for Amendment of this Court's January 31, 1992 Order.

## ORDER

In accordance with the Memorandum Opinion issued herewith and for the reasons stated therein, it is this 29th day of April, 1992,

ORDERED that the motion of Rawl Sales and Processing Co. for reconsideration of this Court's January 31, 1992 Memorandum Opinion and Order is hereby denied; and it is

FURTHER ORDERED that the motion of The Pittston Company, et al., for an amendment of the Court's January 31, 1992 Order is hereby granted in part; and it is

FURTHER ORDERED that the Court's January 31, 1992 Order is hereby amended as follows:

It is FURTHER ORDERED that these cases are hereby certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because they involve controlling questions of law as to which there is substantial ground for difference of opinion and an immediate appeal therefrom may materially advance the ultimate termination of this litigation; and it is

FURTHER ORDERED that the terms of this Memorandum Opinion and Order shall not apply to Thames Development, Ltd. and The Pittston Company.

And it is FURTHER ORDERED that all proceedings in these cases, including the plaintiffs' pending motion for a preliminary injunction, shall be stayed pending the interlocutory appeal.

---

1950 Benefit Plans. *See John Doe v. Connors,* No. 92–0022A (W.D.Va.).

**12.** The Court has also considered the pendency of the appeal of the *Island Creek* cases, which may be dispositive of these cases.