**UNITED MINE WORKERS OF AMERICA 1974 PENSION, et al.,**

v.

**PITTSTON COMPANY, et al., Appellants.**

**UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST**

v.

**RAWL SALES & PROCESSING CO., Appellant.**

Nos. 92–7141, 92–7142.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1992.

Decided Feb. 2, 1993.

Rehearing En Banc Denied March 31, 1993.

470

John M. Wood, Washington, DC, and Gregory B. Robertson, Richmond, VA, with whom Kathleen H. McGuan, Washington, DC, Bruin S. Richardson, Richmond, VA, and Forrest H. Roles, Charleston, WV, were on the joint brief, for appellants. Susan F. Wiltsie, Washington, DC, also entered an appearance for appellants.

Julia P. Clark, with whom Jeremiah A. Collins, and David Allen, Washington, DC, were on the brief, for appellees.

Peter Buscemi, with whom Robert A. Dufek, Stanley F. Lechner and Thomas J. O'Brien, Washington, DC, were on the brief for amicus curiae Bituminous Coal Operators' Ass'n, Inc.

Jonathan D. Schiller and Robert C. Bell, Jr., Washington, DC, was on the brief, for amicus curiae Island Creek Corp., Drummond Co., Inc., Clemens Coal Co., Dunkard Min. Co., Kenellis Energies, Inc., and Penn Allegh Coal Co.

Francis T. Coleman, Mary Lou Smith, Washington, DC, was on the brief, for amicus curiaes Agipcoal USA, Inc., Aloe Coal Co., Beilchick Bros., Bently Coal Co., Inc., Canterbury Coal Co., Tanowia Min. Co., Inc., Myers Coal Co., Oak Grove Coal Co. and Valley Coal Co. David Laurent, Pittsburgh, PA, also entered an appearance for amicus curiae.

Before: EDWARDS, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This appeal presents issues that have been certified by the District Court for interlocutory review pursuant to 28 U.S.C. § 1292(b). The action before us involves a suit brought by the Trustees (the "Trustees") of certain United Mine Workers of America ("UMWA") pension trusts to require pension fund contributions from several coal companies (the "Coal Companies"). The District Court granted summary judgment in favor of the Trustees on the issue of liability, see In re UMWA Employee Benefit Plans Litigation, 782 F.Supp. 658 (D.D.C.1992) ("In re UMWA "), and then, on request of the Coal Companies, certified the matter for interlocutory review.

The parties do not dispute and we agree that the case is properly before this court under 28 U.S.C. § 1292(b). Finding no error in the judgment of the trial court, we affirm and remand for further proceedings.

## I. INTRODUCTION

The underlying facts, including the history of this litigation, are recited in the opinion of the District Court. See In re UMWA, 782 F.Supp. at 660–62. We will not repeat this background, save as necessary to highlight matters of significance for this appeal.

Briefly, this case involves the interpretation of the so-called "evergreen clause"[1] in

---

1. The evergreen clause in the 1981 trust, reprinted in Joint Appendix ("J.A.") at 967, is exemplary and reads in full:

Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1950 Pension Plan, or any Employer who was or is

the pension trust and collective bargaining agreements between the UMWA and the Coal Companies' bargaining representative, the Bituminous Coal Operators' Association ("BCOA"). The evergreen clause was first added to the trust agreements in 1978, and it was incorporated by reference into article XX(d) of the 1978 "National Bituminous Coal Wage Agreement" ("NBCWA"), and in all subsequent collective bargaining agreements between the parties. The clause provided that participating employers (including the appellants) were bound to make continuing contributions to the trusts, and that the amounts of contribution would be as specified in future NBCWAs.

The dispute in this case arose upon the expiration of the NBCWAs to which the appellant Coal Companies were signatories.[2] Instead of entering into successor NBCWAs, the Coal Companies withdrew from the BCOA and negotiated individual labor agreements with the UMWA which included modifications of their contribution obligations to the trusts. The Trustees then brought this suit, contending that the evergreen clause obligates the Coal Companies to continue contributing to the trusts at the levels established in successor NBCWAs.[3]

On cross-motions for summary judgment, the Trustees submitted declarations from witnesses who participated in the 1978 negotiations, along with corroborating documents generated shortly after those negotiations. In response, the Coal Companies argued that it was noteworthy that the Trustees never previously had sought to enforce a claim premised on "perpetual obligations" under the evergreen clause; rather, according to the Coal Companies, the Trustees always had defined claims against other allegedly defaulting employers solely pursuant to "withdrawal liability".[4] After considering the language of the relevant trust and collective bargaining agreements, as well as the interpretive evidence before it, the District Court upheld the Trustees' interpretation of the evergreen clause and granted their motion for summary judgment on the question of liability. *In re UMWA*, 782 F.Supp. at 667.

Defendant Rawl moved the District Court to reconsider its decision and defendant PCG moved for amendment of the District Court's order to satisfy the conditions for interlocutory appeal under 28 U.S.C. § 1292(b). In conjunction with its motion, Rawl submitted new evidence to the District Court; this evidence consisted of declarations of persons familiar with the

required to make, or who has made or makes contributions to the 1950 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1981.

2. The defendants that now comprise the Rawl Companies ("Rawl") were signatory to either the 1978 or 1981 NBCWA or "me too" contracts identical thereto. The defendant PCG Companies ("PCG") were signatory to the 1978, 1981 and 1984 NBCWAs. It is undisputed that the NBCWAs to which the Coal Companies agreed have now expired.

3. The Trustees' "perpetual obligation" interpretation was advanced in a different context in *Connors v. Link Coal Co.,* 970 F.2d 902 (D.C.Cir. 1992). In *Link Coal,* a trust not a party to this

action sued several employers who had negotiated a reduced contribution rate during the term of the 1984 NBCWA. The District Court in *Link Coal* rejected the perpetual obligations theory as a matter of law and granted summary judgment to the employers. *Id.* at 903. This Court reversed, holding that "it is clear that the evergreen clause is, at the very least, susceptible to the Trustees' interpretation." *Id.* at 907. Thus, although we held that the Coal Companies' position was not dictated as a matter of law, we did not finally determine the meaning of the evergreen clause.

4. Under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (1988), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381 *et seq.* (1988), the trustees of multiemployer pension funds may collect "withdrawal liability" from employers who withdraw from the fund. Withdrawal liability typically involves a one-time payment that represents the withdrawing employer's proportionate share of the trust's vested liability that is unfunded in order to prevent a later shortfall.

1978 negotiations who denied that the evergreen clause was understood to create ongoing obligations. In addition, Rawl argued that it had been unfairly denied adequate discovery and that it had several affirmative defenses that should have survived the summary judgment order.

The District Court refused to consider the "new evidence" offered by Rawl, and it denied the motion for reconsideration. *UMWA 1974 Pension Trust v. Pittston Co.*, 793 F.Supp. 339, 344–46 (D.D.C.1992). In disposing of the issues raised by Rawl, the District Court held that Rawl had not been unfairly denied an opportunity to conduct discovery, because there had been no agreement restricting the use of extrinsic evidence and because Rawl had not asked for leave of the court to conduct discovery after the Trustees' summary judgment motion was filed. *Id.* at 341–42. In addition, the District Court concluded that Rawl had waived any affirmative defenses "by not asserting them in its own motion for summary judgment and, more importantly, by not asserting them in its opposition to the Trusts' motion for summary judgment." *Id.* at 344. The District Court did, however, grant an amendment of its order to certify the case for interlocutory appeal. *Id.* at 348.

## II. THE CONSTRUCTION OF THE EVERGREEN CLAUSE

The Coal Companies claim that the District Court erred as a matter of law in construing the evergreen clause. We disagree. The District Court, relying on the words of the agreements and the extrinsic evidence properly before it, concluded that the only reasonable interpretation of the evergreen clause is one premised on a principle of "perpetual obligation." Accordingly, the District Court granted summary judgment for the Trustees. We have reviewed this judgment *de novo, Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1466 (D.C.Cir.1990), and, pursuant to this review, we agree with the conclusion reached by the District Court.

█ In cases requiring the court to construe the meaning of a contract, the dispute may be resolved as a matter of law if the contested agreement admits of only one reasonable interpretation. *Link Coal Co.*, 970 F.2d at 904. Moreover, in divining the meaning of contract terms, the court is not limited to the four corners of the agreement: the party moving for summary judgment may submit affidavits and other extrinsic evidence that gives color to the words of the agreement or otherwise reveals the intent of the contracting parties at the time of the agreement. *See* FED. R.CIV.P. 56(e); *see also Link Coal*, 970 F.2d at 904–905 (extrinsic evidence considered to determine the meaning of the evergreen clause). If the moving party demonstrates that no material factual issue remains, the burden then shifts to the nonmoving party to produce specific evidence that sufficiently contradicts or undermines the movant's case to demonstrate a material factual dispute. *Bias v. Advantage Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C.Cir.), *cert. denied*, 498 U.S. 958, 111 S.Ct. 387, 112 L.Ed.2d 397 (1990). In order to carry this burden and avoid summary judgment, the evidence submitted by the non-moving party must show that more than one *reasonable* interpretation exists. *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C.Cir.1990).

█ Applying this analytical framework to the contract provisions at hand, we conclude that the District Court was fully justified in granting summary judgment in favor of the Trustees. The language of the relevant provisions in the applicable trust and collective bargaining agreements unambiguously obliges signatory employers to contribute to the trusts at the rates specified in the current NBCWA, irrespective of the employer's failure sign that NBCWA. The evergreen clause in the trust documents clearly does not include a durational limitation to the employer's duty to contribute to the trusts. *See* note 1, *supra*. Although the clause does allow for modifications in "successor agreements," the structure of the clause and the reference to the current NBCWA, through the use of "thereto," indicate that only a subsequent NBCWA can qualify as such a suc-

cessor agreement. Furthermore, section XX(d)[5] of the NBCWAs, which incorporates the evergreen clause by reference, comprehends only the termination of the particular NBCWA and the contribution rates specified therein; it does not, contrary to the Coal Companies' protestations, provide for the general termination of the *duty to contribute* to the trusts. Thus, by accepting the terms of section XX(d), these employers agreed to be bound by the evergreen clause to make continuing contributions to the trusts; and this obligation included an agreement to make contributions at rates specified in subsequent NBCWAs, without regard to whether the employer was still a party to the subsequent agreements. The Coal Companies cannot now rely on their refusal to sign successor NBCWAs to release them from a previously agreed-upon perpetual obligation.[6]

This plain construction of the evergreen clause is corroborated by voluminous extrinsic evidence submitted by the Trustees. First, the Trustees submitted the sworn declarations of five people who were directly involved in the negotiations that led to the inclusion of the evergreen clause in the 1978 trust documents.[7] In addition, the Trustees submitted copies of notes and minutes prepared contemporaneously with those negotiations which indicate an inten-

tion to create a continuing obligation, *see, e.g.,* BCOA Proposals (Jan. 23, 1978), *reprinted in* J.A. at 689 (protection for BCOA against withdrawals from trusts), and various BCOA and UMWA documents prepared shortly after the negotiations were concluded, *see, e.g.,* Memorandum of B.M. Shaner, Manager of Employee Benefits for Bethlehem Steel Corporation, to John O'Connell, Vice President for Labor Relations, Bethlehem Steel Corporation (May 23, 1978), *reprinted in* J.A. at 594–95 (evergreen clause structured to prevent withdrawals from the funds). Finally, the District Court was provided with public statements made by negotiators of the evergreen clause which confirmed the Trustees' posited interpretation. *See, e.g., Multiemployer Pension Plan Amendments Act of 1979: Hearings on H.R. 3904 Before the Subcomm. on Labor–Management Relations of the House Comm. on Educ. and Labor,* 96th Cong., 1st Sess. 418 (1979) (statement of Donald Pierce, economist, UMWA). Thus, not only is the language of the evergreen clause clear in its effect of permanently binding signatory employers to the contribution rates established in current NBCWAs, but it appears that negotiators on *both* sides of the bargaining table at the 1978 negotiations understood the import of that language.

---

5. Section XX(d) of the 1981 NBCWA, reprinted in J.A. at 971, is typical and contains the following language:

> During the life of this Agreement, for the periods of time indicated below, each signatory Employer engaged in the production of coal shall contribute to the Trusts referred to in this Article the amounts specified below....
>
> ....
>
> (i) Into the 1950 Pension Trust: for the period beginning June 7, 1981, and ending June 6, 1982, 95.0 per ton on each such ton; for the period beginning June 7, 1982, and ending June 6, 1983, $1.11 per ton on each such ton; and for the period beginning June 7, 1983, and ending when this agreement is terminated, $1.11 per ton on each such ton....

6. We have no reason to question the propriety of an employer agreeing to be bound to contractual duties beyond the life of a specific collective bargaining agreement. *See Litton Fin. Printing Div. v. NLRB,* — U.S. —, —, 111 S.Ct. 2215, 2226, 115 L.Ed.2d 177 (1991) (dis-

putes regarding benefits that are to continue after collective bargaining agreement's expiration are deemed to arise under the agreement); *see also United Steelworkers of America v. Connors Steel Co.,* 855 F.2d 1499, 1504–05 (11th Cir.1988) (employer contracted to provide insurance benefits beyond expiration of collective bargaining agreement), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989).

7. *See* Declaration of Donald E. Pierce, Jr., Consultant to the UMWA members of the Benefits Subcommittee of the 1978 negotiations (Feb. 27, 1991), *reprinted in* J.A. at 563; Declaration of B.M. Shaner, Benefits Subcommittee member during the 1978 negotiations (Mar. 4, 1991), *reprinted in* J.A. at 587; Declaration of David W. Kempken, Benefits Subcommittee member during the 1978 negotiations (Mar. 5, 1991), *reprinted in* J.A. at 596; Declaration of K.L. Young, Benefits Subcommittee member during the 1978 negotiations (Mar. 5, 1991), *reprinted in* J.A. at 619; Declaration of Roger M. Haynes, Chairman of the Benefits Subcommittee for the 1978 negotiations (Mar. 7, 1991), *reprinted in* J.A. at 639.

Confronted with this well supported motion for summary judgment, the Coal Companies were able to respond only with a counter-intuitive reading of the pertinent language and references to the Trustees' failure to previously enforce the perpetual obligations explicit in the contract provisions. The Coal Companies' first argument—that section XX(d) of the NBCWAs provides for the termination of the contribution obligation at the expiration of the agreement—is directly at odds with the language of that section. Section XX(d) plainly does not purport to define the durational limits of the contribution requirement, but instead details the amounts due to be paid during specified periods by employers already bound to contribute. *See* note 5, *supra.* Similarly unconvincing is the Coal Companies' argument that the evergreen clause allows for the modification of contribution requirements in non-NBCWA labor agreements. As mentioned above, the phrase allowing for modifications in successor agreements clearly refers to the prior NBCWA, leading us to the natural inference that the only "successor" agreement to an NBCWA is another NBCWA. Hence, we are not persuaded that the plain language of the relevant provisions accommodates the Coal Companies' interpretation.[8]

Moreover, the Coal Companies provided no extrinsic evidence to substantiate the reasonableness of their interpretation. While the case was being considered on summary judgment, the Coal Companies relied almost exclusively on the Trustees' supposed inconsistent conduct in an attempt to demonstrate that the Trustees have only recently invented the perpetual obligations interpretation of the evergreen clause. This conduct was comprised primarily of the Trustees' use of withdrawal liability rather than suits under the evergreen clause in several earlier instances in which signatory employers failed to contribute to the funds at the rates specified in the NBCWA. *See, e.g., Connors v. Peles,* 724 F.Supp. 1538 (W.D.Pa.1989); *Connors v. B & W Coal Co.,* 646 F.Supp. 164 (D.D.C. 1986). However, in the cases cited to us, it appears that the companies upon whom the Trustees sought to impose withdrawal liability all were having financial problems.[9] Thus, it is hardly surprising that the Trustees invoked the withdrawal liability rules to garner one-time payments rather than rely upon the evergreen clause to secure a continuing contribution obligation from entities that were seen heading toward demise. Indeed, since the legal basis for withdrawal liability does not turn upon the contractual provisions at issue in this case, the Trustees have never taken a contrary position on the meaning of the evergreen clause itself.[10] We will not infer that the Trustees previously had a different interpretation of the clause simply because they made a rational business decision to sue under an alternative theory when certain employers failed to pay into the funds.

In sum, the Trustees provided the District Court with a compelling argument and specific evidence indicating that theirs was the only reasonable interpretation of the

---

**8.** The Coal Companies also make a contextual argument based on changes made to the 1988 NBCWA, *reprinted in* J.A. at 998, that provide for withdrawal liability in the event that an employer ceases to be obligated to contribute to the trusts. This argument, too, is flawed. First, the language in the 1988 NBCWA creating withdrawal liability only applies if the employer is not otherwise obligated to contribute to the funds (*e.g.,* no new NBCWA is enacted); it does not imply that the drafters of the 1988 agreement understood that employers have the right to terminate their obligations. More fundamentally, the understanding of the drafters of the 1988 NBCWA is immaterial for the purpose of divining the intent of the drafters of the 1978 NBCWA.

**9.** For instance, in *Peles,* the Trustees filed suit against Pelbro Fuel in 1983 for withdrawal liability, *Combs v. Pelbro Fuel, Inc.,* No. 88–1524 (D.D.C. May 27, 1983), and the company was out of business by 1985, *Peles,* 724 F.Supp. at 1542. Likewise, in *B & W Coal Co.,* the court found that the company had withdrawn from the funds in March of 1981, *B & W Coal Co.,* 646 F.Supp. at 167, only four months prior to the company's ultimate failure in July, *see* Joint Brief for Appellants at 11.

**10.** Since the evergreen clause was not litigated in the withdrawal liability cases, it appears that no court has ever concluded that the evergreen clause does not require continuing contributions by signatory employers.

evergreen clause and that no material factual dispute remained for trial. The Coal Companies responded with an untenable reading of the contractual language and general evidence that the Trustees' interpretation of the evergreen clause is of recent origins. This evidence falls far short of what is necessary to undermine or contradict the Trustees' evidence. *See, e.g., Bias,* 905 F.2d at 1561 (general evidence that decedent was not the type of person to use cocaine insufficient to contradict specific testimony of persons who had used drugs with decedent). Thus, we affirm the District Court's award of summary judgment to the Trustees.

### III. RAWL'S MOTION FOR RECONSIDERATION

 For many of the same reasons already mentioned, we find no basis upon which to reverse the District Court's refusal to reconsider its decision in light of the alleged "new evidence" belatedly produced by Rawl. Under the Federal Rules of Civil Procedure, a District Court may reconsider its final judgments based on newly discovered evidence if that evidence was unavailable at the time of the judgment. *See* FED.R.CIV.P. 60(b)(2) (due diligence required); *see also Stoller v. Marsh,* 682 F.2d 971, 981 (D.C.Cir.1982) (newly discovered evidence submitted with a 60(b) motion only considered if it was unavailable before summary judgment), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 787 (1983). Moreover, the decision to grant or deny a rule 60(b) motion is committed to the discretion of the District Court and, unless the decision is "rooted in an error of law," should only be reversed if it constitutes an

abuse of discretion. *Twelve John Does v. District of Columbia,* 841 F.2d 1133, 1138 (D.C.Cir.1988).

 Here, it is undisputed that most, if not all, of the information that Rawl belatedly sought to submit with its motion for reconsideration was available before the District Court ruled on summary judgment. Rawl maintains, however, that the parties agreed in an earlier phase of the litigation [11] to forego discovery because the court could decide the case without considering extrinsic evidence, and that the court had entered an order reflecting that agreement. Upon reviewing both the order staying discovery and the transcript of the scheduling conference that led to that order, we find no indication that the court precluded the consideration of extrinsic evidence in ruling on the summary judgment motions. *See UMWA 1974 Pension Trust v. Rawl Sales & Processing Co.,* No. 3:90–0890 (S.D.W.Va. Jan. 24, 1991) (order suspending time frame order pending decision on summary judgment); *UMWA 1974 Pension Trust v. Rawl Sales & Processing Co.,* No. 3:90–0890 (S.D.W.Va. Jan. 14, 1991) (transcript of scheduling conference). Indeed, Rawl's putative reliance on such an agreement is belied by its own submissions of extrinsic evidence in support of its cross-motion for summary judgment. Thus, it does not appear that Rawl was in any way misled about the scope of the District Court's inquiry in disposing of this case on summary judgment.

Furthermore, Rawl has failed to demonstrate that it was prejudiced by the supposed lack of discovery. Rawl rested its motion for reconsideration primarily on af-

---

**11.** The Trustees originally sued Rawl in the United States District Court for the Southern District of West Virginia. *See UMWA 1974 Pension Trust v. Rawl Sales & Processing Co.,* No. 3:90–0890 (S.D.W.Va. filed Sept. 19, 1990). In that suit, the parties filed cross-motions for summary judgment. The District Court, with the agreement of the parties, entered an order staying discovery pending disposition of the summary judgment motions, unless the parties agreed to conduct discovery or unless the court granted permission to conduct discovery for good cause shown. *See UMWA 1974 Pension Trust v. Rawl Sales & Processing Co.,* No. 3:90–0890 (S.D.W.Va. Jan. 24, 1991) (order suspend-

ing time frame order pending decision on summary judgment). Prior to ruling on the motions for summary judgment, the case was transferred by the Judicial Panel on Multidistrict Litigation to the District of Columbia where it was consolidated with the PCG cases. *See In re UMWA Employee Benefit Plans Litigation,* No. 886 (J.P.M.L. Dec. 12, 1991) (transfer order). In this District, Rawl filed a motion for oral argument on its pending motion for summary judgment, but did not move for additional discovery. *See* Memorandum in Support of Rawl's Motion for Oral Argument (Jan. 2, 1992), *reprinted in* J.A. at 302.

fidavits from individuals involved in the 1978 negotiations who averred that they were not aware of the continuing obligation aspect of the evergreen clause at that time. *See, e.g.,* Affidavit of E. Morgan Massey, Director of the BCOA in 1978 (Feb. 13, 1992), *reprinted in* J.A. at 838. In addition, Rawl submitted a document created by the Trustees which allegedly evidenced the Trustees' policy of pursuing withdrawal liability rather than continuing contributions under the evergreen clause. *See* Minutes of the 281st Meeting of the UMWA Board of Trustees (Aug. 26, 1981), *reprinted in* J.A. at 1069. Rawl frankly admits that it could have obtained most of this material prior to the District Court's summary judgment ruling. *See* Rawl Brief at 14. Thus, Rawl's objection to the lack of discovery rings hollow.

■ In any event, even if we were to consider the material belatedly offered by Rawl, we would still conclude that the District Court did not abuse its discretion by refusing to reconsider its judgment. A party opposing summary judgment, when faced with specific evidence that demonstrates the absence of a material factual dispute, cannot defeat the motion simply by offering general denials. *See Bias,* 905 F.2d at 1561. Here, none of the affidavits or declarations submitted in conjunction with the motion for reconsideration were of persons who negotiated or drafted the evergreen clause. Rawl's evidence merely abjured the Trustees' allegations—it did not contradict the first-hand accounts of the evergreen clause negotiations offered by the Trustees. Therefore, it was not an abuse of discretion for the District Court to conclude that Rawl's new information failed to demonstrate the existence of a material factual dispute.

## IV. Subsidiary Issues

We briefly address the remaining claims by the Coal Companies only to reaffirm the law of this Circuit.

### A. *Judicial Estoppel*

■ The Coal Companies maintain that judicial estoppel should bar the Trustees from asserting their present interpretation of the evergreen clause because of the tension between it and their litigating position in the withdrawal liability cases. However, we have not previously embraced the doctrine of judicial estoppel in this circuit [12] and we decline to do so in this case. In the circuits that recognize the doctrine, judicial estoppel is used to preclude a party from taking a position that is inconsistent with one successfully asserted by the same party in a prior proceeding. *See, e.g., Astor Chauffeured Limousine Co. v. Runnfeldt Invest. Corp.,* 910 F.2d 1540, 1547–48 (7th Cir.1990); *see also American Methyl Corp. v. EPA,* 749 F.2d 826, 833 n. 44 (D.C.Cir. 1984) (where recognized, judicial estoppel limited "to cases in which a party prevails on a claim in one court and proceeds in a calculated manner to manipulate a second court by asserting facts at odds with those advanced before the first court"). Since the present case involves wholly distinct issues and facts from those of the withdrawal liability cases, the Trustees have not been required to contradict earlier sworn statements or present conflicting interpretations of the evergreen clause to successive tribunals. Furthermore, there is no indication that the Trustees have deliberately set out to manipulate the system or to unfairly burden the Coal Companies with compound judgments. *Cf. Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1397 (7th Cir.1992) (judicial estoppel prevents a party from using inconsistent positions to win two judgments arising from the same claim). In this case the Trustees have simply asserted alternative grounds for recovery against different litigants based on different sets of facts. Hence, even if we were to recognize judi-

---

12. *See Konstantinidis v. Chen,* 626 F.2d 933, 936–38 (D.C.Cir.1980). In *Konstantinidis,* we explained that judicial estoppel is designed to preserve the integrity of the judicial system and the sanctity of sworn statements. *Id.* at 937. However, far from endorsing judicial estoppel as the most appropriate means of effectuating that policy, we expressed a preference for the "determination of cases on the basis of the true facts as they might be established ultimately." *Id.* at 938.

cial estoppel in this circuit, this case does not present a scenario that would lead us to seriously consider its application.

## B. Issue Preclusion

The Coal Companies also argue that the Trustees' claims are barred by issue preclusion resulting from the disposition of the withdrawal liability cases. Issue preclusion prohibits a party from relitigating an issue in a subsequent proceeding if the issue was actually litigated in an earlier proceeding and determined by a court of competent jurisdiction, and if the preclusion would not be unfair to the precluded party. See Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); Connors v. Tanoma Mining Co., 953 F.2d 682, 684 (D.C.Cir. 1992). In the present suit, the prerequisites for issue preclusion are clearly not satisfied by the Trustees' litigation of the withdrawal liability cases. As we noted above, the issue in the withdrawal liability cases was not the same as that in this case. Consequently, the meaning of the evergreen clause has never before been litigated to a final conclusion and, hence, there is no basis to hold the issue precluded in the present case.

## C. Rawl's Waiver of Defenses

Rawl next complains of the District Court's holding that Rawl waived several affirmative defenses by not raising them in opposition to the Trustees' motion for summary judgment. See UMWA 1974 Pension Trust v. Pittston Co., 793 F.Supp. 339, 344 (D.D.C.1992). First, Rawl argues that it should not be deemed to have waived a defense based upon the statute of limitations since it had no opportunity to raise this argument after the case was transferred to this District Court and prior to the summary judgment ruling. However, as noted above, Rawl did file a motion prior to the summary judgment order. Since disposition on summary judgment would resolve the case as a matter of law, Rawl naturally should have briefed dispositive legal defenses like the running of the limitations period. Instead, Rawl merely asserted that it had certain defenses, one of which was based on the statute of limitations, that were not applicable to the other defendants. See Memorandum in Support of Rawl's Motion for Oral Argument, reprinted in J.A. at 306. In support of its motion, Rawl explained that, "these additional defenses are laid out in detail in Rawl's briefs ... that were filed in the United States District Court for the Southern District of West Virginia in 1991." Id. Yet, because the running of the limitations period was plainly not an issue under West Virginia law, the briefs filed in that court make no mention of the defense. Thus, the failure to brief the limitations defense before summary judgment in this District was the result of Rawls' omission, not lack of opportunity.

In addition, Rawl argues that it did not raise other affirmative defenses at the summary judgment stage because those defenses required discovery to develop. As a general rule, though, the failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an abandonment of the defense. See, e.g., Attorney General of United States v. Irish People, Inc., 595 F.Supp. 114, 120 n. 9 (D.D.C.1984) (affirmative defenses abandoned when not raised at summary judgment stage), aff'd in part and rev'd in part on other grounds, 796 F.2d 520 (D.C.Cir.1986); Pantry Inc. v. Stop–N–Go Foods, Inc., 796 F.Supp. 1164, 1167–68 (S.D.Ind.1992) ("[t]his Court knows of no authority for holding that affirmative defenses are somehow latent and survive a partial summary judgment to be argued at trial—even though the complete issue of liability has been determined."). Thus, we affirm the District Court's holding that Rawl abandoned its affirmative defenses by not raising them prior to summary judgment.

## D. Waiver of Bargaining Rights

Finally, the Coal Companies argue that the Trustees' interpretation of the evergreen clause cannot have the effect of precluding employers from renegotiating contribution rates because, under Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983), bargaining rights are only subject to "clear and unmistakable" waiver. This

argument is specious and we reject it as such.

As we explained in detail in *Link Coal,* the "waiver" argument misses the distinction between the waiver of a right and the exercise of a right that extends into the future. 970 F.2d at 905. "[T]o the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining." *Id.* Here, the UMWA and the BCOA agreed on a basis for determining the employers' pension fund contributions. When the Coal Companies signed onto the applicable agreements, they bound themselves to abide by the agreed-upon contribution rates into the future. This was a valid exercise of bargaining rights, and the agreement reached by the parties is fully enforceable against the Coal Companies. There is no issue of waiver in this case.

### V. CONCLUSION

For the reasons set out above, we hold that the District Court properly granted the Trustees' motion for summary judgment on the issue of liability. The judgment of the District Court is therefore affirmed and the case is remanded.

*So ordered.*