921 F.2d 276
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CONN AIRE, INC., Plaintiff-Appellee,
v.
J.C. LEASING, a Tennessee general partnership composed of
Dean Dhom, James Fleming, Joe C. Luttrell, and
Ronald T. Stone, Defendant-Appellant.
 No. 90-5143.
 United States Court of Appeals, Sixth Circuit.
 Dec. 19, 1990.
 
 On Appeal From the United States District Court for the Middle District of Tennessee, No. 88-00289, Thomas Higgins, J.
 M.D.Tenn., (APPEAL AFTER REMAND FROM, 878 F.2d 1436)
 AFFIRMED
 Before RALPH B. GUY and BOGGS, Circuit Judges, and BERTELSMAN, District Judge.*
 RALPH B. GUY, JR., Circuit Judge.
 
 
 1
 This case presents an appeal from an order of the United States District Court for the Middle District of Tennessee, affirming the bankruptcy court's judgment that defendant, J.C. Leasing, materially breached a purchase agreement made with Conn Aire, Inc. (Conn Aire), thereby terminating Conn Aire's obligations to J.C. Leasing under a related lease agreement. J.C. Leasing contends that the district court erred: (1) in affirming the ruling that defendant materially breached the purchase agreement by selling certain rights and obligations under the purchase agreement without also binding the assignee to the purchase agreement's covenant not to compete; (2) in finding that defendant had materially breached the covenant not to compete with Conn Aire by permitting competition; and (3) in affirming the holding that Conn Aire had not waived its rights under the covenant not to compete. For the reasons set forth below, we affirm.
 
 I.
 
 2
 On April 15, 1985, Conn Aire, an air charter business, entered into two related agreements: a purchase agreement and a lease agreement. Conn Aire entered into the purchase agreement with Jet Center Corporation (the parent corporation), Corporate Air Fleet of Tennessee, Incorporated (the seller and a subsidiary corporation), Nashville Jet Center, Incorporated (a sister corporation to Corporate Air Fleet), and Dean Dhom, James Fleming, Joe C. Luttrell, and Ronald P. Stone (principals). In the purchase agreement, Corporate Air Fleet agreed to sell to Conn Aire its corporate name and customer list; Nashville Jet Center (NJC) granted Conn Aire exclusive rights for charter flights from NJC's terminal facility at the Nashville Metropolitan Airport, and also agreed to provide Conn Aire with fuel; and Corporate Air Fleet, NJC, Jet Center Corp., Dean Dhom, James Fleming, Joe C. Luttrell, and Ronald P. Stone all agreed to be bound by a six-year covenant not to compete.
 
 
 3
 The provision in the purchase agreement containing the covenant not to compete, as well as a provision regarding successors, heirs, and assigns, provide in pertinent part as follows:
 
 
 4
 8. Covenant Not to Compete. To induce [Conn Aire] to assume the Lease, and realizing that without such covenants as contained herein [Conn Aire] would not agree to assume the Lease, Seller, Parent, NJC, and Principals agree that for the six (6) year period after the date of this Agreement, they will not continue in or enter the air charter business or in any way become involved in the air charter business. Specifically and without limitation, Seller, Parent, NJC, and the Principals agree that they will not own, operate, manage, consult, or in any way assist any person other than [Conn Aire] involved in the air charter business. NJC shall for the period of this Agreement not permit any other air charter service to use NJC's facilities....
 
 
 5
 11. Successors, Heirs, and Assigns. Any reference herein to any party shall include such party's heirs, successors and assigns, and such heirs, successors, and assigns shall be bound by the terms of this Agreement.
 
 
 6
 (App. 30-31).
 
 
 7
 In the lease agreement, J.C. Leasing, a Tennessee general partnership comprised of Dhom, Fleming, Luttrell and Stone, agreed to lease to Conn Aire a Commander aircraft for $22,000 per month. As security to cover its obligation under the terms of the lease, Conn Aire agreed to provide a letter of credit in the amount of $150,000, which J.C. Leasing could draw upon if Conn Aire defaulted. The lease incorporated by reference the terms of the purchase agreement with the following language:
 
 
 8
 22. This Agreement is being executed in conjunction with an Agreement of even date herewith by and among the general partners of Lessor, Lessee, Nashville Jet Center, Inc., and Corporate Air Fleet of Tennessee, Inc., and the terms hereof are incorporated therein by reference. In the event that any party thereto other than Lessee violates the terms thereof, or in the event that any representations or warranties by a party other than Lessee contained therein prove to be materially false, then Lessee's obligations under this Agreement shall terminate.
 
 
 9
 (App. 21). In turn, the purchase agreement incorporated the terms of the lease as follows:
 
 
 10
 3. Commander Lease. [Conn Aire] in conjunction with this Agreement is entering into a lease agreement for the lease of 1982 Gulfstream American 900 Jetprop Commander, Registration Number N990JC, Serial No. 15011 (the "Lease"), the terms of which are incorporated herein by reference. Any failure of Seller, NJC, and the Principals to perform their respective obligations hereunder shall terminate any and all obligations of [Conn Aire] under the Lease. (Emphasis added).
 
 
 11
 (App. 28).
 
 
 12
 In September 1985, less than five months after the parties entered into these agreements, Nashville Jet Center sold its fixed-base operation to BNA Jet, Inc. During the same month, Conn Aire became aware of the sale. BNA Jet continued the operation under the name of Nashville Jet Center (hereinafter New NJC). In connection with that sale, New NJC assumed the obligations of the original Nashville Jet Center set forth in the purchase agreement relative to providing fuel to Conn Aire and allowing Conn Aire to operate its charter business from the NJC terminal. However, it did not assume the covenant not to compete.[1]
 
 
 13
 On March 3, 1986, Conn Aire filed a petition with the bankruptcy court under Chapter 11 of the Bankruptcy Code. During the bankruptcy proceeding, Conn Aire agreed to continue the lease agreement, although modifying it so that the monthly payment of $22,000 was decreased to $14,000. Additionally, in lieu of the $150,000 letter of credit, J.C. Leasing agreed to accept a $120,000 letter of credit and a $30,000 certificate of deposit.
 
 
 14
 By way of a letter dated December 4, 1986, counsel for Conn Aire informed counsel for New NJC that "[w]e are informed by our client ... that [New] Nashville Jet Center is presently allowing Omni Aviation and perhaps other air charter businesses to operate out of its facilities." The letter further states: "Accordingly by this letter we are calling upon the [New] Nashville Jet Center to honor the terms of the covenant not to compete as set out in paragraph 8 of the [purchase] agreement." (App. 38). By way of a letter dated December 31, 1986, counsel for New NJC informed counsel for Conn Aire that "the covenant not to compete contained in paragraph 8 of the [purchase] agreement of April 15, 1985, is not binding upon [New Nashville] Jet Center." (App. 41). This statement was based on the purchase agreement entered into between New NJC and the original Nashville Jet Center.
 
 
 15
 Conn Aire subsequently failed to make the next lease payment, which, under the terms of the lease, was due on January 15, 1987. The lease provides that Conn Aire is in default if it "fails to pay any amounts due to Lessor within fifteen (15) days of due date," and that upon such default J.C. leasing may terminate the lease and "shall be entitled to the proceeds of the [$150,000] letter of credit." (App. 18-19). J.C. Leasing repossessed the Commander aircraft on February 3, 1987, and on February 4, 1987, Conn Aire tendered the January 15 lease payment. Conn Aire continued to use the airplane until it was repossessed.
 
 
 16
 On February 5, 1987, Conn Aire filed suit in federal court seeking a declaration that its obligations under the lease agreement were terminated when Nashville Jet Center sold its operation to New NJC without requiring it to assume the covenant not to compete, and seeking return of the $150,000 posted as security.
 
 
 17
 A trial was held on March 18, 1987. According to the evidence, two charter flights not operated by Conn Aire used the New NJC facilities on October 29 and November 12, 1986. Although New NJC had not assumed the covenant not to compete, David McKenna, the general manager of New NJC, testified that only Conn Aire was authorized to provide charter service from New NJC's fixed-based operation, and that New NJC monitors the launching of charter flights in an attempt to insure that unauthorized flights do not occur. The bankruptcy court entered its memorandum and order on May 5, 1987, finding as follows:
 
 
 18
 After considering the evidence, the testimony of the witnesses, and the entire record, this court finds that Conn Aire bargained for a six-year covenant not to compete; that this covenant was supported by consideration; that the original Nashville Jet Center knew of this covenant, appreciated its importance to Conn Aire, and understood its obligations to bind assigns to this covenant; and that five months after agreeing to the covenant, the original Nashville Jet Center breached the covenant by not binding the owners of the new Nashville Jet Center to this covenant, thereby terminating J.C. Leasing's ability to call upon the letter of credit or the certificate of deposit.
 
 
 19
 (App. 332-33).
 
 
 20
 The bankruptcy court subsequently ordered partial final judgment in favor of Conn Aire as to the $150,000 security deposit, and J.C. Leasing appealed from that order. The district court summarily affirmed the bankruptcy court's order, due to J.C. Leasing's failure to a file a designation of issues and records, and J.C. Leasing appealed. This court vacated that judgment and remanded the case to the district court for determination of whether the failure to file a designation was in bad faith. On remand, the district court determined that the failure to file a designation of issues and records was not in bad faith, and proceeded to consider the merits of the appeal. The court affirmed the bankruptcy court, and J.C. Leasing appeals.
 
 
 21
 Because J.C. Leasing does not appeal the district court's finding that the covenant not to compete has value and that consideration was given therefor, we do not need to examine those issues. Similarly, because defendant never challenged the noncompetition clause as an invalid restraint on trade, we need not examine that question.
 
 II.
 
 22
 Defendant first challenges the conclusion that it materially breached the purchase agreement when it failed to bind its successor to the covenant not to compete. On this issue, there is no dispute as to the underlying facts. The only controversy between the parties concerns the proper interpretation of the covenant not to compete and the provision governing successors, heirs, and assigns. Consequently, the bankruptcy and district court's finding, that the purchase agreement legally obligated J.C. Leasing to bind its successors, involves a question of law to which we apply a de novo standard of review. In re Edward M. Johnson & Assoc., 845 F.2d 1395, 1398 (6th Cir.1988) (interpretation of stock sale agreement); Dayton Power & Light Co. v. Federal Energy Regulatory Comm'n, 843 F.2d 947, 954 (6th Cir.1988) (construction of contract and intent of parties); Lancaster Glass Corp. v. Phillips ECG, Inc., 835 F.2d 652, 658 (6th Cir.1987) (interpretation of contract).
 
 
 23
 J.C. Leasing contends that its sale of the terminal facility operation to New NJC, without contractually requiring New NJC to assume the covenant not to compete between NJC and Conn Aire, does not by itself constitute a breach of the purchase agreement. Conn Aire argues, and the courts below agree, that because J.C. Leasing agreed in paragraph 11 of the purchase agreement that its successors and assigns would be bound by the terms of the purchase agreement, J.C. Leasing breached the purchase agreement by not binding the owners of New NJC to the obligations of the covenant not to compete. By way of explanation, Conn Aire argues that because the covenant required NJC to not permit any other air charter business to use NJC's facilities at the Metropolitan Airport, and because defendant did not expressly delegate that obligation when it sold its operations to New NJC, defendant effectively divested itself of any power to fulfill that obligation by conveying all of its interest in the premises. J.C. Leasing acknowledges that it remains liable under the covenant, but responds that an apparent inability to perform an obligation does not alone constitute a breach, particularly if the assignee, despite no legal obligation to do so, performs the obligation.
 
 
 24
 We are not persuaded that either paragraph 11 or paragraph 8, read together or separately, demonstrates that J.C. Leasing promised to bind subsequent assignees to the noncompete covenant. Neither Conn Aire nor the courts below cite any authority for the proposition that where a contract provides that "heirs, successors, and assigns shall be bound by the terms of this agreement," the parties thereby promise, in the event that they assign any rights under the agreement, to simultaneously delegate their entire duty under the agreement.[2] We find nothing under Tennessee law, which governs the interpretation and enforcement of these contracts, or elsewhere, to support such a conclusion. Under such an interpretation, the effect of contracting with a party "and his assigns" would be to deny parties the power to convey rights without conveying duties. Such a contention is contrary to the prevailing interpretation of the law of contracts:
 
 
 25
 Suppose that A contracts to render a service, non-personal in character, for B, in return for B's promise to pay compensation, the contract to be "binding upon the parties and their assigns."...
 
 
 26
 The phrase "binding upon the parties and their assigns" does not deprive A of the power to assign his right to compensation to one who does not assume the duty of rendering service. It may, however, be a factor tending toward an inference that the assignee does assume the duty.
 
 
 27
 4 A. CORBIN, CORBIN ON CONTRACTS Sec. 871 (1951). Thus, insofar as the bankruptcy and district courts held that paragraph 11 required the defendant to bind successors to the covenant not to compete, and insofar as this was the sole basis for finding that J.C. Leasing materially breached the purchase agreement, such ruling was in error.
 
 
 28
 However, by conveying all of its interest in the terminal facility, the defendant divested itself of the ability to perform its obligations under the covenant not to compete. This amounts to a breach of the purchase agreement by repudiation. Contrary to J.C. Leasing's contention, an apparent inability to perform an obligation may constitute a breach, if the inability to perform arises from the voluntary affirmative act of the promisor. Although an action for restitution or damages is ordinarily not allowed until there has been an actual failure to perform, where one party voluntarily acts to disable himself from performing his obligations under a contract, such act is a repudiation of his duties to render performance which discharges the other party's remaining duties to render performance. RESTATEMENT (SECOND) OF CONTRACTS Secs. 250(b) and 253(2)(1981); Roehm v. Horst, 178 U.S. 1, 8 (1900); see also Ricketts v. Adamson, 483 U.S. 1, 17 (1987) (Brennan, J., dissenting).
 
 
 29
 Furthermore, an assignment accompanied by any voluntary affirmative action by the assignor which renders substantial performance apparently impossible may justify the obligor in suspending his own performance, and the legal effect of the repudiation is "not limited by the fact that the assignee is a competent person and has promised to perform the duty." RESTATEMENT (SECOND) OF CONTRACTS Sec. 329(1) and comment a. It is of no consequence that New NJC might honor the noncompete covenant, for it remains undisputed that J.C. Leasing divested itself of the power to perform the duties imposed by the covenant, and that New NJC is not legally obligated to prohibit other air charter flights from using its terminal.
 
 
 30
 Finally, it does not matter that there is no express manifestation of the repudiation, as repudiation by conduct has the same legal effect as repudiation in words. Id. at Sec. 250; 4 A. CORBIN, CORBIN ON CONTRACTS Secs. 973 and 984 (1951). See, e.g., Garcia v. Eidal Int'l Corp., 808 F.2d 717, 722 (10th Cir.1986), cert. denied, 484 U.S. 827 (1987); United Corp. v. Reed, Wible and Brown, Inc., 626 F.Supp. 1255, 1257 (D.V.I.1986).
 
 
 31
 Conn Aire also asserts that defendants were guilty of bad faith when they assigned their rights to a party they knew was able and likely to compete, without binding that party to the noncompete clause. This argument suggests that, even if J.C. Leasing did not violate the express terms of the agreement, it violated the duty of good faith and fair dealing implied in every contract. Rather than consider the good faith duty issue here, we address it with Conn Aire's second basis for claiming breach, which relates to the issue of substantial performance.
 
 III.
 
 32
 Conn Aire argues that J.C. Leasing breached the noncompete clause when its successor in interest, New NJC, allowed charter services other than Conn Aire to use its facilities. Paragraph 22 of the purchase agreement and paragraph 3 of the lease specifically provide that the failure of J.C. Leasing to perform its obligations under either contract will terminate all obligations of Conn Aire under those agreements. J.C. Leasing does not dispute that it is obligated under the purchase agreement not to permit any other air charter service to use the NJC terminal, nor does it dispute that the exclusive use provision of the covenant not to compete has been violated. However, defendant maintains that evidence of only two charter flights in violation of this clause represents a de minimis departure from the agreement, that such deviation does not constitute a material breach, and that defendant's substantial performance under the contract argues against the harshness of forfeiture of the lease agreement where Conn Aire has not been deprived of the benefits of the contract, or otherwise suffered damages.
 
 
 33
 When performance is due, anything short of full performance is a breach, even if the defect in performance was not substantial. RESTATEMENT (SECOND) OF CONTRACTS Sec. 235 comment b (1981). Having concluded that J.C. Leasing breached the noncompete covenant when at least two charter service flights, not operated by Conn Aire, used the facility, the legal consequences depend upon whether the breach was material. Generally, a material failure in performance with respect to an exchange of promises excuses the other party's obligation of performance, at least temporarily, and in some cases may excuse it entirely. Id. Sec. 237 comment a. The considerations in determining whether performance is substantial are the same as those listed in section 241 of the RESTATEMENT (SECOND) OF CONTRACTS for determining whether a failure is material. See id. Sec. 237 comment d. The following circumstances are significant:
 
 
 34
 (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
 
 
 35
 (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
 
 
 36
 (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
 
 
 37
 (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
 
 
 38
 (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.
 
 
 39
 RESTATEMENT (SECOND) OF CONTRACTS Sec. 241 (1981).
 
 
 40
 It is evident from the foregoing list of factors that materiality is a question of fact to be determined by looking at the circumstances of the particular case. Todd v. Heekin, 95 F.R.D. 184, 186 (S.D.Ohio 1982); See Canada Dry Corp. v. Nehi Beverage Co., 723 F.2d 512, 517 (7th Cir.1983). It is well settled that findings of fact of a bankruptcy court shall not be set aside unless clearly erroneous. In Re Edward M. Johnson & Assoc., 845 F.2d at 1400; Bankr.R. 8013; see also Bankr.R. 7052 (Fed.R.Civ.P. 52 applies in adversary bankruptcy proceedings). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 41
 In determining whether the bankruptcy court erred, we are mindful that Tennessee courts appear to de-emphasize Restatement factors (a) and (c), relative to the other factors, when analyzing the doctrine of substantial performance. The Tennessee Court of Appeals recently reversed a trial court's refusal to enforce the termination provision of a contract, even though the failure to comply with requirements of the contract produced no loss to the party seeking forfeiture. Gardner v. Gilreath, CA No. 174 (Tenn.App. Sept. 13, 1990). The appellate court held that while no loss had been sustained by either party, that did not mitigate the parties' obligation to conform to the contract, stating that "it is not within the prerogative of this court to say that something substantially less than the requirements of the lease gives the parties to the lease reasonably adequate protection. We are required to construe the lease as written; we are not at liberty to rewrite the lease or make a new contract between the parties." Id., slip op. at 5. A contract must be "enforced as written even though it contains terms which may be thought harsh and unjust." Ballard v. North American Life & Casualty Ins. Co., 667 S.W.2d 79, 82 (Tenn.App.1983).
 
 
 42
 The foregoing indicates a reluctance of Tennessee courts to apply the doctrine of substantial performance in a manner that denies giving effect to the terms of a contract, including provisions for termination of the contract in the event of a breach. On the other hand, the extent to which the breaching party comports with standards of good faith and fair dealing, the fifth Restatement factor, has been determined to impose obligations not literally provided by the contract. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Covington v. Robinson, 723 S.W.2d 643, 645 (Tenn.App.1986). Good faith requires reasonable efforts to perform the terms of the contract, Id. at 646, and to cooperate with and not hinder the performance of obligations under the contract. See Moore Constr. Co. v. Clarksville Dept. of Elec., 707 S.W.2d 1, 14 n. 30 (Tenn.App.1985).
 
 
 43
 Upon reviewing the record in light of the applicable law, we are not persuaded that the bankruptcy court committed a mistake when it concluded that J.C. Leasing failed to substantially perform the covenant not to compete, thereby materially breaching its agreement with Conn Aire. The record shows that competing charter flights embarked and landed at New NJC's terminal; that NJC never attempted to bind New NJC to the covenant not to compete; and that NJC could not assure that competing flights would not use the terminal. From these facts, it is not erroneous to infer that Conn Aire was deprived of the benefits of exclusive use, that NJC's failure to attempt to bind New NJC to the covenant not to compete was behavior departing from standards of good faith and fair dealing, and that NJC could not offer reasonable assurances to Conn Aire of future compliance with the covenant.
 
 IV.
 
 44
 The issue of whether Conn Aire waived the exclusive use provision of the purchase agreement is also a question of fact. See Canada Dry, 723 F.2d at 518. Defendant argues that Conn Aire waived its right to call on the forfeiture provisions in paragraph 22 of the purchase agreement and paragraph 3 of the lease agreement, because it did not repudiate the agreements in September 1985 when it first learned of the assignment of the purchase agreement by NJC to New NJC. According to defendant, delaying a claim of breach until February 1987, while continuing to enjoy the benefits of the agreement by purchasing fuel, landing and launching charter flights at the terminal, and using the Commander aircraft, estops Conn Aire from asserting a breach of the noncompete covenant as a bar to its obligations under the lease. However, we must agree with the district court that there is no evidence to support a finding that Conn Aire was dilatory in asserting its rights or waived its right to bring the breach of contract action.
 
 
 45
 "[A] waiver is an intentional relinquishment of a known right, whereas an estoppel can be maintained only on the ground that by the fault of one party, another has been induced to change his position for the worse in such a manner that it would operate as a virtual fraud on him to allow the party by whom he had been misled to assert the right in controversy." Webb v. Board of Trustees of Webb School, 271 S.W.2d 6, 19 (Tenn.App.1954). In the absence of conduct creating an estoppel, a waiver must be supported by an agreement founded upon a valuable consideration, Moss v. Aetna Life Ins. Co., 73 F.2d 339, 341 (6th Cir.1934), and may be established by express declarations or acts manifesting an intent not to claim the right. Hill v. Goodwin, 722 S.W.2d 668, 671 (Tenn.App.1986). Defendant asserts no express declarations on the part of Conn Aire but, rather, appears to assert estoppel by arguing that waiver may be inferred from Conn Aire's conduct. The Tennessee Supreme Court has said:
 
 
 46
 Where by the course of conduct of one party to a contract entitled to the performance of certain terms or conditions thereof, the other party has been led to believe, as a man of average intelligence, that such performance will not be required, until it has become too late to perform ... the person who has so conducted himself is barred from asserting the right he had.
 
 
 47
 Baird v. Fidelity-Phoenix Fire Ins. co., 162 S.W.2d 384, 389 (Tenn.1942), quoting BIGELOW, BIGELOW ON ESTOPPEL, 717 (6th ed.).
 
 
 48
 Although Conn Aire was aware of the sale of operations between NJC and New NJC in September 1985, Conn Aire's acquiescence to that transaction does not demonstrate a voluntary relinquishment of the noncompete covenant. The record demonstrates that Conn Aire only discovered that competing flights were using New NJC facilities in November or December 1986. Conn Aire then called upon New NJC to honor the noncompete agreement in a letter dated December 4, 1986, believing that the purchase agreement between Conn Aire and J.C. Leasing had been assigned in full. Conn Aire only learned that New NJC did not assume the noncompete covenant upon receipt of a letter from New NJC dated December 31, 1986. It cannot be said that Conn Aire led J.C. Leasing to believe that enforcement of the noncompete covenant was not required. In fact, the record supports the finding that it was J.C. Leasing who, at the time of the New NJC transaction, misled Conn Aire by indicating that Conn Aire was going to be fully protected under the original agreement, and that New NJC had assumed all obligations under the original agreement.
 
 
 49
 The decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable William O. Bertelsman, United States District Court for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Only those rights and obligations arising out of paragraphs five and six of the purchase agreement were assigned to New NJC. Paragraph five provides in part, and paragraph six provides in full, as follows:
 
 
 [5]
 Use of NJC Facilities and Purchase of Aircraft Fuel. Buyer [Conn Aire] and NJC agree that for a period of six (6) years from the date hereof, Buyer may launch its charter flights from Nashville, Tennessee from NJC's facilities at Hanger Number 9, Metropolitan Airport, Nashville, Tennessee, and Buyer shall have the right to enplane and deplane its customers at said facilities and Buyer's customers shall be entitled to use said facilities, including but not limited to NJC's parking area for automobiles of Buyer's customers
 For the first three-year period after the date of this Agreement, in consideration of Buyer's use of the NJC facilities, Buyer agrees to pay NJC the sum of Two Thousand ($2,000) Dollars per month.
 In addition, NJC agrees to sell to Buyer aircraft fuel during the first three year period at the prices per gallon, depending on the volume of monthly purchases, herein set out....
 
 
 [6]
 Charter Service. NJC presently is required by its lease with The Metropolitan Nashville Airport Authority, pertinent portions of which are attached hereto as Exhibit B, to provide charter services as a condition of said lease. Under said lease, NJC can and hereby does satisfy this requirement by contracting with Buyer for the provision of charter services. Buyer hereby agrees to perform charter services as required by said lease during the term of the Lease. The obligations of Seller, NJC, and the Principals thereafter are contingent upon Buyer's continued satisfaction of NJC's obligation to provide charter services
 (App. 28-29).
 
 
 [2]
 The words "assignment" and "delegation" are terms of art. An assignment involves the transfer of rights. A delegation involves the appointment of another to perform one's duties. J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS Sec. 18-1 (1977)