CITIBANK (SOUTH DAKOTA),
N.A., Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION in its own capacity and as
Receiver for Bank of New England,
N.A., The Connecticut Bank and Trust
Company, N.A., and Maine National
Bank, Defendants.

Civ. A. No. 92–0162.

United States District Court,
District of Columbia.

May 4, 1994.

Nunc Pro Tunc May 2, 1994.

John A. Buchman, Alston & Bird, Washington, DC, John K. Train, Alston & Bird, Atlanta, GA, for plaintiff.

Christopher Kohn, Lloyd Randolph, Robert M. Hollis, Civ. Div., Dept. of Justice, Washington, DC, for defendants.

## REVISED[1] MEMORANDUM OPINION ON MOTION FOR RECONSIDERATION

THOMAS F. HOGAN, District Judge.

On April 14, 1993, this Court issued a Memorandum Opinion ("Mem." or "April 14 Opinion") holding that, as a matter of law, the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") does not protect the Federal Deposit Insurance Corporation ("FDIC") from liability for actual direct compensatory damages caused by repudiation of a non-compete provision. In that Opinion, the Court "found that the non-compete provision could have value prior to repudiation and that the FDIC could be held liable for damages as a result." Mem. at 1. The Court also held that under 12 U.S.C. § 1821(e)(3)(A)(ii), damages caused by the repudiation are measured on the date the receiver was appointed, not on the date of repudiation. Mem. at 5. Consequently, the Court granted plaintiff's motion for summary judgment and denied defendants' motion.

The FDIC has moved for reconsideration of the April 14 Opinion. The parties have extensively briefed the motion[2] and presented oral argument to the Court. For the reasons set forth below, the Court will grant in part and deny in part the motion for reconsideration.

## I. BACKGROUND

### A. Summary of the Relevant Facts

Most of the facts underlying this Opinion are set forth in the April 14 Opinion. Those most pertinent to the Court's decision today, however, are summarized below.

Citibank (South Dakota) N.A. ("Citibank") seeks damages allegedly arising from the FDIC's disaffirmance of an agreement between Citibank and Bank of New England, N.A., The Connecticut Bank and Trust Company, N.A., and Maine National Bank (collectively referred to as the "BNE Banks"). By means of the agreement, entitled Credit Card Portfolio Purchase and Sale Agreement ("the Agreement" or "Citibank Agreement"), Citibank purchased certain assets and assumed certain liabilities associated with the credit card businesses of each of the BNE Banks. Citibank claims that part (approximately $28 million) of the $180 million premium it paid for this agreement represents a payment for contractual rights, including a four-year covenant preventing the BNE Banks from soliciting credit card business from former BNE cardholders. Mem. at 2; Agreement § 14, at 29–31. Unlike other sections of the Agreement, however, the non-compete provision does not explicitly bind purchasers of specific assets from the BNE Banks. Cf. Agreement § 9.8. Nevertheless, the Agreement does provide in Section 38, captioned "Successors," that "[t]his Agreement shall be binding upon and inure

---

1. The Court is issuing this Revised Memorandum Opinion on this date of May 4, 1994, because of printing formatting errors that occurred in the May 2, 1994 Memorandum Opinion on pages 13, 15 and 17.

2. The parties have filed, and the Court has considered, the following briefs and memoranda in support of and in opposition to the motion for reconsideration: "FDIC–Receivers' Memorandum in Support of Motion for Reconsideration of Partial Summary Judgment for Citibank" ("FDIC Recon. Mem."); "Citibank's Response Brief in Opposition for the FDIC–Receivers' Motion for Reconsideration of Partial Summary Judgment for Citibank" ("Citibank Recon. Opposition"); "FDIC–Receivers' Reply Supporting Motion for Reconsideration of Partial Summary Judgment for Citibank" ("FDIC Recon. Reply"); "Citi-

bank's Surreply Brief in Opposition to the FDIC–Receivers' Motion for Reconsideration of Partial Summary Judgment for Citibank" ("Citibank Surreply"); "Citibank's Supplemental Brief in Opposition to the Receivers' Motion for Reconsideration" ("Citibank Supp. Brief"); "FDIC–Receivers' Response to Citibank's Supplemental Surreply on Motion for Reconsideration of Partial Summary Judgment for Citibank" ("FDIC RSS"); "Citibank's Notice of Recent Relevant Authority and Factual Matters Resulting from Discovery" ("Citibank Notice"); "Receivers' Statement Regarding Recent Discovery Relating to Fleet" ("Receivers' Statement"); "FDIC–Receivers' Response to Citibank's Notice of Recent Relevant Authority and Factual Matters Resulting from Discovery" ("FDIC Response to Citibank Notice"); and "Citibank Reply to the Receivers' Response to Citibank's Notice of Recent Relevant Authority" ("Citibank RRR").

to the benefit of the parties and their successors and permitted assigns." Agreement at 43. The Agreement does not explicitly define the terms "successors" and "permitted assigns."

On January 6, 1991, approximately one year after the Agreement, the Comptroller of the Currency declared the BNE Banks insolvent and named the FDIC as a separate receiver for each of them. The FDIC as Receiver transferred certain assets and liabilities—but not the Citibank Agreement—to Bridge Banks. Less than one month later, the FDIC announced the sale of certain of the BNE Banks' assets and liabilities to Fleet/Norstar Financial Corporation ("Fleet") without the encumbrance of the non-compete provision. Mem. at 3. On March 27, 1991, in preparation for sale of the BNE Banks' assets, the FDIC formally repudiated the Agreement pursuant to 12 U.S.C. § 1821(e)(1). Fleet has subjected Citibank to competition for credit card business. FDIC Recon.Mem. at 2.

### B. Grounds Asserted By FDIC For Reconsideration

The April 14 Opinion held that

[t]he non-compete provision was a valuable contractual right that was fully paid for and operative prior to the date the BNE Banks declared their insolvency. Prior to the date of receivership, Citibank had an unqualified right to expect that the BNE Banks and all other successors in interest to the BNE Banks would perform their obligations under the non-compete provision.

Mem. at 6–7.

The FDIC claims that "[i]n concluding that the non-compete provision had value as of the date the BNE Banks failed, the Court apparently assumed that the Bridge Banks and Fleet were 'successors in interest' to the BNE Banks, and would have been bound by the Non–Compete Provision if the Agreement had not been repudiated." FDIC Recon.Mem. at 3. According to the FDIC, the Court based this assumption on the erroneous impression that the receivers, as a factual matter, transferred all of the assets of the BNE Banks and that the BNE Banks were

sold as a "going concern." *Id.* at 4–10. The FDIC asserts that "[t]his assumption is inconsistent with the stipulated facts and applicable law" and that, as a consequence, the Opinion "is erroneous and should be vacated." *Id.* at 3.

The FDIC also asserts that the Opinion erroneously concludes, as a legal matter, that the non-compete provision binds all other successors in interest to the BNE Banks, including transferees of assets and liabilities other than the Agreement itself. In contrast to Citibank, the FDIC asserts that the "Successors and Assigns" provision (Section 38) does not obligate the FDIC to pass on the non-compete obligation to the Bridge Banks. The FDIC interprets the phrase "successors and permitted assigns" as being "limited to successors and assigns *of the Agreement,* not to anyone who purchased assets or assumed liabilities (other than the Agreement itself) of the BNE Banks." FDIC RSS at 4. The FDIC states that it is the "final successor" to the Agreement and that it has continued to honor the non-compete obligation. *Id.* It maintains that because it was not obligated to transfer the Agreement to the Fleet Banks under § 1821(d)(2)(G)(i)(II), *see Payne v. Security Savings & Loan Ass'n, F.A.,* 924 F.2d 109, 111 (7th Cir.1991), the Fleet Banks were free to compete with Citibank. FDIC Recon. Reply at 8–9. Thus, the FDIC claims that the Court incorrectly premised its decision on the assumption that but for the Receivers' repudiation of the Agreement Citibank would have enjoyed the Fleet Banks' non-competition in the credit card market. *Id.* at 8.

Finally, the FDIC disputes the proposition that the repudiation of the contract could cause Citibank any "actual damages." According to the FDIC, the absence of any obligation on the part of the FDIC in the Agreement to pass-on the non-compete provision means that the breach occasioned by the repudiation could cause Citibank only nominal damages, not recoverable under FIRREA as a matter of law. FDIC Recon. Reply at 6–10; Aug. 11, 1993 Hearing Tr. at 18. The FDIC claims that Citibank's "damages" were caused by the BNE Banks' failure and the FDIC's decision not to transfer

the Agreement to Fleet. FDIC Recon. Reply at 7. The FDIC maintains, therefore, that there were no actual damages traceable to the repudiation and that Citibank may recover nothing. *Id.* at 9–10. The FDIC adds that "[t]he BNE Banks' failure and the Receivers' non-transfer of the Citibank Agreement meant Non–Compete damages could arise only if the Receivers issued credit cards themselves, used cardholder lists to compete or assist another in its competition with Citibank, or knowingly assisted another in soliciting Account cardholders." *Id.* at 10. The FDIC maintains that it has continued to honor the Agreement because it has engaged in none of these activities. *Id.;* FDIC RSS at 4.

### C. Citibank's Response

Citibank, naturally enough, stands firmly behind the Court's April 14 Opinion. As an initial matter, Citibank contends that the BNE "banking franchise did not disappear upon the BNE Banks' insolvency, but was instantly passed on to the Receivers upon their appointment. It is this going concern that, with minor modifications, was passed to the Bridge Banks on that same day." Citibank Surreply at 8. Citibank bargained for the right to keep this "banking franchise" or "going concern" out of competition for its credit card customers, not merely the formal entities comprising the BNE Banks. "[T]he BNE Banks could not eliminate their obligations under the Non–Compete Provisions by selling their banking franchise but retaining a shell, non-operating, bank or bank holding company (which would not compete with Citibank)." *Id.* at 3.

Citibank points to two sources of this constraint on the BNE Banks' and hence, the FDIC's ability to transfer the BNE Banks' banking franchises. First, Citibank claims that the constraint originates in Section 38 of the Agreement, the "Successors" provision. Citibank Recon. Opposition at 2–4. Second, Citibank claims that the constraint arises

from the FDIC's "obligation to ensure that the BNE Banks' banking franchise was not used to solicit or to assist others in soliciting Citibank Account customers. By transferring the bulk of the assets of the former BNE Banks to the Bridge Banks, the Receivers did not eliminate their obligation to ensure compliance with the terms of the Non–Compete Provision." Citibank Surreply at 8. Rather, by effecting this transfer the Receivers voluntarily disabled themselves from the ability to comply with the non-compete provision. *Id.* at 7; *see also* Aug. 11, 1993 Hearing Tr. at 16.[3] Thus, Citibank claims that even if it "were required to show some affirmative 'breach' over and above the Receivers' formal repudiation, such a breach clearly results from the Receivers' disabling themselves from performing their obligations under the Non–Compete Provisions." *Id.* at 3–4.

Citibank also asserts that the Receivers' formal repudiation of their obligations under the non-compete provision itself gives rise to damages as of the receivership date. Thus, the fact that subsequent to that date the Receivers passed BNE Bank assets to Fleet unencumbered by the non-compete provision is irrelevant. *Id.* at 3. Moreover, Citibank disputes the FDIC's causation argument as being illegitimately premised on the assumption that the time to measure the value of the non-compete provision is on the date of repudiation, not the date of receivership as required by the statute. In Citibank's view, "the Receivers' formal repudiation of the Citibank Agreement caused actual, direct and compensatory damages to which Citibank is entitled without regard to whether there are other, additional actions by the Receivers that constitute a breach of that agreement." *Id.* at 4. Additionally, Citibank asserts that the value of the non-compete obligation may not be affected by events subsequent to the date of receivership. *Id.* at 11–12.

---

3. Citibank also makes the claim that the receivers knowingly assisted the Bridge Banks' efforts to solicit credit card customers for Fleet. *See* Citibank Surreply at 7; Citibank Notice at 5–7; *cf.* FDIC RSS at 6–8; Receivers' Statement at 1–2. Due to the existence of an apparently substantial difference of opinion as to the material facts surrounding this issue, however, the Court finds that this issue is inappropriate for summary judgment. The parties' evidence on this issue may be presented during the damages phase of this proceeding.

## II. DISCUSSION

### A. Standards Applicable to Motions for Reconsideration

An order granting partial summary judgment on liability issues is interlocutory in nature. Fed.R.Civ.P. 56(c); *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 744, 96 S.Ct. 1202, 1206–07, 47 L.Ed.2d 435 (1976). Motions to reconsider interlocutory orders are within the discretion of the trial court, subject to appellate review under the abuse of discretion standard. *United Mine Workers of Am.1974 Pension Trust v. Pittston Co.*, 793 F.Supp. 339, 344–45 (D.D.C.1992), *aff'd*, 984 F.2d 469 (D.C.Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 3039, 125 L.Ed.2d 726 (1993). Interlocutory judgments are therefore subject to the complete power of the court rendering them to afford such relief from them as justice requires. *Id.* at 345, citing Fed.R.Civ.P. 60(b) Advisory Comm. Note and 7 Moore's Federal Practice, ¶ 60.-20; *see also Schoen v. Washington Post*, 246 F.2d 670, 673 (D.C.Cir.1957) (Burger, J.) (so long as district court has jurisdiction over an action it has complete power over interlocutory orders therein and may revise them when consonant with equity).

### B. The FDIC Was the Successor to the BNE Banks and Was Obligated to Comply With the Terms of the Non-compete Provision

The parties are in agreement that the FDIC breached the Agreement by repudiating it. FDIC Recon. Reply at 7; Citibank Recon. Opposition at 6. The FDIC, however, claims that this breach merely caused Citibank to suffer nominal damages because the Agreement imposed no obligation on the FDIC to pass on the non-compete provision to the Bridge Banks and Fleet.

Citibank contends that Section 38 of the Agreement creates this obligation. Section 38, captioned "Successors," provides that "[t]his Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns." Agreement at 43. Although the parties agree that the FDIC is the final successor to the Citibank Agreement, FDIC Recon. Mem. at 15, FDIC Recon. Reply at 5, Citibank Surreply at 5, Citibank claims that the "assigns" language binds the FDIC to pass on the non-compete to any transferee of BNE Bank assets. August 11, 1993 Hearing Tr. at 12. The FDIC counters that the "assigns" language should be read narrowly to mean assigns *of the Agreement.* FDIC Recon. Mem. at 9; FDIC Recon. Reply at 4–6; FDIC RSS at 4.

The Court finds the FDIC's argument more compelling. Section 38 does not speak of "assigns" in general, but rather of "permitted assigns." There is no reason to believe that these "permitted assigns" are not those "permitted" by agreement of the parties pursuant to Section 30 of the Agreement. Section 30 reads in full:

> *ASSIGNMENT AND DELEGATION.* No party may *assign this Agreement* to or delegate any of its functions hereunder to any other party without the prior written consent of the other parties; provided that the Buyer may *assign this Agreement* to an affiliate, but no such assignment shall relieve the Buyer of liability for any breach of this Agreement.

Agreement § 30 (emphasis added). This language strongly suggests that the "permitted assigns" referred to in Section 38 are assigns of the Agreement, just as the FDIC claims. Thus, the Court is unpersuaded by Citibank's argument that Section 38 is sufficient to bind any party subsequently taking assets or assuming liabilities of the BNE Banks to the non-compete provision, and consequently cannot hold that Section 38 obligated the FDIC to bind the Bridge Banks or Fleet to the non-compete.[4] Nevertheless, this determination does not mean that the FDIC is immune from liability. Nor does it alter this Court's previous decision that "the non-compete provision could have value prior to repudiation and that the FDIC could be held liable for damages as a result." Mem. at 1.

---

4. *See also NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F.Supp. 1004, 1015 (S.D.N.Y.1991) ("successors and assigns" clause in "requirements" contract held not to bind purchaser of assets to continue contract).

It is the opinion of the Court that as the undisputed successor to the BNE Banks, the FDIC had an obligation to comply with the Agreement and its non-compete provision, pursuant to Section 38. Moreover, the FDIC's obligation to comply with the Agreement necessarily encompasses the obligation not to voluntarily disable itself from complying with it. It is apparent to the Court, as the Sixth Circuit held in *Conn Aire, Inc. v. J.C. Leasing*, 921 F.2d 276 (table), 1990 WL 209580 (6th Cir. Dec. 19, 1990) (unpublished), that one can disable one's self from complying with a non-competition agreement by alienating the asset or entity capable of competing without subjecting subsequent transferees to the non-compete obligation.[5] In this case, after the FDIC became the successor to the BNE Banks, it had the ability to breach the Agreement by transferring the BNE Banks' banking franchise to another entity without the encumbrance of the non-compete obligation.[6] It was obligated to refrain from doing so. The obligation does not arise from the language of section 38, but rather from the nature of the contract. The Court's decision, therefore, does not rest on the presumption that Fleet was the successor to the BNE Banks. It rests on the fact that the FDIC was the successor and that by repudiating the Agreement it breached its obligation to Citibank not to disable itself from complying with that obligation. Thus, the Court's affirmative answer to the "crucial question" of "whether Citibank had an unqualified right to expect performance of the non-compete provision on the date of receivership" (Mem. at 6) remains unchanged. In this regard, the FDIC's motion for reconsideration is denied.

## C. Questions Concerning Actual Damages Caused by the Repudiation Are Disputed Questions of Material Fact to be Decided in the Damages Phase of this Proceeding

Given that the FDIC did breach a duty to Citibank to pass the non-compete obligation to the Bridge Banks and Fleet, it cannot be said as a matter of law that Citibank has suffered only nominal damages. Nevertheless, the Court believes there is merit to the FDIC's position that Citibank

---

5. In *Conn Aire*, the Sixth Circuit interpreted a "successors" provision—coupled with a non-compete requirement—largely similar to the provision at issue here. By a series of cross-agreements, defendants granted Conn Aire exclusive rights for charter flights from defendant's terminal facility at the Nashville Metropolitan Airport. All the parties agreed to be bound by a six-year covenant not to compete. Five months after the agreements were entered into, defendant sold its terminal facilities to another company, but the new company did not assume the covenant not to compete. The Court of Appeals was unpersuaded that a contractual provision binding successors and assigns amounted to a promise to bind subsequent assignees of the terminal facility to the non-compete provision. Nevertheless, the court held the defendant liable for breaching the non-compete because conveyance of the terminal facility—the assets by means of which competition could be accomplished—amounted to a repudiation of the defendant's ability to perform the non-compete provision. "[W]here one party voluntarily acts to disable himself from performing his obligations under a contract, such act is a repudiation of his duties to render performance which discharges the other party's remaining duties to render performance." *Id.* 1990 WL 209580, at ** 4, citing Restatement (Second) of Contracts §§ 250(b) and 253(2) (1981).

*Conn Air* demonstrates that even absent explicit language binding the assignees of an asset to an agreement not to use that asset in competition with another, a party contracting not to compete can breach the agreement by disabling itself from complying with the non-compete obligation by alienating control of the asset thereby enabling the undesired competition. *See also NCC Sunday Inserts, supra*, 759 F.Supp. at 1015 (asset purchaser not liable to supplier for asset seller's termination of requirements contract when asset purchase agreement did not specifically provide for assumption of liability to supplier, but supplier could seek relief for breach of contract from asset seller, which retained liability); C.J.S. Assignments § 97 (where the assignee does not assume the obligations of the agreement, the assignor remains liable for full performance thereunder).

6. The Court need not determine whether the FDIC did, in fact, breach the non-compete obligation by its pre-repudiation transfer of the BNE Banks' assets and liabilities to the Bridge Banks unencumbered by the non-compete obligation. It need not determine that there was such a *de facto* repudiation because the parties agree that the FDIC's formal repudiation of the Agreement was the operative breach in this case. Citibank Surreply at 4; FDIC Recon. Reply at 7. The principle illustrated by *Conn Aire, supra*, is simply that an obligation capable of being breached did, in fact, exist at the time of receivership.

can only recover those actual damages *caused* by the repudiation.

The central problem of this case arises from the fact that non-competition rights cannot exist in gross. By definition, they always exist appurtenant to some entity—be it a person, a going business, or physical or intangible asset—that is capable of competing or being used to compete with the party which has contracted for the right of non-competition. Accordingly, a non-compete agreement with an entity that is incapable of competing is essentially valueless.[7]

In this case, the entities that were capable, at the time the non-compete agreement was entered into, of competing with Citibank for credit card business were going concerns known as the BNE Banks. Those entities have (at least nominally) ceased to exist. The FDIC transferred many of the BNE Banks' assets and liabilities to Bridge Banks, sold them to Fleet, and retained others as Receiver. In many instances the FDIC repudiated agreements that would have proved burdensome to Fleet. It may be the case that the FDIC unbundled the BNE Banks' assets and liabilities in such a way that it is not possible that an entity assuming those assets and liabilities (Fleet) can use them to compete with Citibank for its credit card customers. Alternatively, it may be the case that the FDIC transferred the BNE Banks' assets and liabilities relatively intact, thereby preserving their "going-concern" value and enabling the entity assuming those assets and liabilities (Fleet) to better compete with Citibank. If the BNE Banks' assets and liabilities are now so disaggregated as to preclude Fleet from using them to compete for Citibank's credit card business, it would be difficult to see how Citibank has suffered actual compensable damages from the FDIC's repudiation of the non-competition

agreement. If, however, the FDIC has enhanced the capacity of Fleet to compete with Citibank, then Citibank has suffered actual direct compensable damages. The appropriate measure of such damages may be coextensive with the increased competitive capacity of Fleet attributable to the FDIC's transfer of the BNE Bank assets and liabilities without the encumbrance of the non-compete provision.[8]

Whether Citibank has suffered actual damages as a result of the repudiation turns, however, on a disputed question of material fact, namely, were the BNE Banks transferred to the Bridge Banks and Fleet as "going concerns"? Citibank claims that after the transfer, Fleet

> continued to service the banking needs of the former BNE Bank customers in the context of what had been the BNE Banking franchise, running the very bank branches that the former BNE customers considered "their banks." It is these customers' relationships and identification with those banks that necessitated the Non–Compete Provision. The prospect of a successor's running these banks and using such relationship to competitive advantage by soliciting the credit card business of the former BNE cardholders is the very business risk which caused Citibank to demand, and to pay for, the Non–Compete Provision—and the very risk to which the FDIC–Receivers exposed Citibank by its repudiation. Citibank's statement to this Court that the BNE Banks "were, in effect, sold as a going concern to a combination of Fleet and KKR" is an accurate portrayal of the underlying facts, and consistent with the courts' understanding of P & A Agreements. . . .

---

7. *See In re Worcester Quality Foods, Inc.,* 152 B.R. 394, 403–04 (Bankr.D.Mass.1993) (non-compete agreement between debtor company and debtor's founder held to have no significant intangible value to debtor because founder had previously retired and chances of his working for anyone other than debtor were slim); *In re Turner,* 147 B.R. 989 (Bankr.D.Wyom.1992) (no value assigned to taxpayers' non-compete agreement for tax purposes where contract did not allocate portion of purchase price to agreement

and taxpayers did not have the ability to compete).

8. The increased competitive *capacity* of Fleet is not to be confused with any increased competitive *activity* by Fleet. It is irrelevant whether Fleet actually has used or will use the assets and liabilities it has assumed in competition with Citibank.

Citibank Recon. Opposition at 5. *See also* Citibank RRR at 3–4.[9]

The FDIC, however, vigorously disputes this statement. The FDIC points out that among the 190 agreements it did not transfer to Fleet were leases for 44 bank branches, 59 applications software license and maintenance agreements, contracts for the sale of bank branches, 10 agreements on automated teller machine networks and lease agreements, and 25 equipment lease agreements. FDIC Recon. Mem. at 7–8, citing Fact Stip. Exh. 42. Indeed, "[t]he record does not reveal how many branches were transferred, or whether former BNE customers considered branches, instead of the failed BNE Banks, to be 'their banks'." FDIC Recon. Reply at 6. Consequently, the FDIC maintains that Fleet did not take over the "going concern" of the former BNE Banks.

This factual dispute is at the heart of the "causation" question and thus, the measure of damages at issue in this case. This dispute is, however, a genuine dispute of material fact to be resolved in the damages phase of this proceeding. It is instructive, but ultimately irrelevant, that specific purchase and assumption agreements in *other* cases may have involved the transfer of a failed bank as a "going concern." *See, e.g., FDIC v. Clark,* 978 F.2d 1541, 1545 (10th Cir.1992). What is of importance is whether or not *in this case* the FDIC transferred the BNE Banks' operations to Fleet as "going concerns." To the extent that the April 14 Opinion, by ambiguous reference to the BNE Banks' "successors in interest" (Mem. at 6), suggests that this

issue had been decided in favor of Citibank, the Court expressly disavows that implication. To this extent, the FDIC's Motion for Reconsideration is granted. The key issue is whether the FDIC in fact transferred a set of BNE Bank assets and liabilities that could be characterized as the "going concerns" that were the BNE Banks—the entities whose non-competition Citibank sought to ensure by entering into the Agreement. On the existing record, the Court cannot determine the extent to which the BNE Banks' assets and liabilities have been disaggregated or maintained intact,[10] and cannot resolve this question on a motion for summary judgment. It remains to be seen what damages the FDIC's repudiation has caused Citibank and what damages are recoverable under FIR-REA.

### D. Other Matters

■ Three minor matters remain to be resolved. First, Citibank has claimed that the FDIC's motion for reconsideration had no basis in fact or law and that the motion was interposed to cause unnecessary delay and needlessly increase the cost of litigation. Citibank Recon. Opposition at 6–7. Having found merit in some of the FDIC's positions, the Court must disagree with Citibank's characterization and reject its suggestion for the imposition of sanctions pursuant to Fed. R.Civ.P. 11.

Second, the Court expresses no opinion on the import of the "Yeck Bros. Memorandum" (Document 402283–403387), the deposition

9. Citibank has also apparently taken the more extreme position that even if the BNE Banks were not transferred to the Bridge Banks and Fleet as "going concerns," it is entitled to the full value of the non-compete provision as of the date of receivership. *See* March 23, 1993 Hearing Tr. at 25 ("The FDIC might have some basis for its argument [that Citibank has not lost the benefits of the non-compete provision], *although we don't think so,* if it had in fact liquidated these BNE Banks, and just put them out of business and they were gone....") (emphasis added). This position would obviously implicate the Court's duty—pointed out by Citibank itself—to avoid conferring a windfall to either of the parties. *Cf. Citibank Fed.Savings Bank v. FDIC,* 836 F.Supp. 3, 8 (D.D.C.1993) (court may not perpetrate injustice of permitting government to obtain windfall at expense of private parties).

10. Measures which could constitute such disaggregation might include the non-transfer of the 44 bank branch leases, and the Bridge Banks' delivery of computer tape containing the BNE Banks' Master List of Accounts to Citibank prior to Fleet's acquisition of certain assets. FDIC Recon. Reply at 4, citing Fact Stip. Exh. 40. The going concern value may, conversely, have been maintained by virtue of continuing BNE Bank customer loyalty to their local bank branches and the possible failure of the Bridge Banks of preventing Fleet from having access to the BNE Banks' Master List of Accounts. *See* Receivers' Statement at 1–2. However, as noted above, these issues are incapable of being addressed on this record.

testimony of Elaine Weeks, or any other documents—allegedly implicating the FDIC in the solicitation of Citibank card holders by the Bridge Banks—on the damages phase of this case.

Finally, Citibank's motion to strike the FDIC's "Response to Citibank's Notice of Recent Relevant Authority" is denied, and its motion for leave to file a reply brief is granted.

### CONCLUSION

Consistent with the foregoing Memorandum Opinion, the FDIC's Motion for Reconsideration of the Court's April 14, 1993 Opinion is GRANTED IN PART AND DENIED IN PART.