OPINION OF THE COURT
Richard B. Lowe III, J.
Motion sequence numbers 007 and 008 are herewith consolidated for disposition. In motion sequence number 007,. defendant Reed Elsevier Inc. (Reed Elsevier) moves for an order dismissing the amended verified complaint of plaintiff, Credit Index, L.L.C. (TCI), dated May 3, 2001 (the amended complaint), as against Reed Elsevier, pursuant to CPLR 3211 (a) (7), on the ground that the amended complaint fails to state a cause of action as against Reed Elsevier.[1] In motion sequence number 008, TCI moves for an order disqualifying the law firm of Proskauer Rose LLP (Proskauer) from its representation of defendants herein. As discussed herein, the motion to dismiss is denied, and the motion to disqualify is granted.
Background
TCI and RiskWise Inti. L.L.C. (RiskWise) are each in the risk management business. They sell products and services to help companies reduce credit risk by, among other things, processing lists of potential customers for their credit and purchase histories. TCI and RiskWise, together with certain affiliates, defendants RiskMagic L.L.C., RiskWise L.L.C., and Business Transactions Express, Inc. (collectively, referred to as RiskWise) signed a contract entitled “Master Agreement,” dated as of June 30, 1999.
The Master Agreement established a strategic relationship between TCI and RiskWise. TCI provided RiskWise with, *757 among other things, a license of TCI data (including its “Negative File” data, which contains risk information collected on an ongoing basis from approximately 60 direct marketing companies), a minority equity interest in TCI, and a covenant that TCI would not sell its data to certain RiskWise competitors. In return, TCI received, among other things, a covenant that neither RiskWise, nor its affiliates, would sell their products to direct marketing customers (DM companies), and that Risk-Wise would hold the “Negative File” as well as any other sensitive information it received from TCI, including the identity of TCI’s customers, strictly confidential.
Section 2.6 (g) of the Master Agreement prohibits RiskWise and its affiliates from providing any risk management services or solutions to these companies. That section provides that:
“No RiskWise Party, or any affiliate thereof, shall, during the term of this Agreement, or for a period of four years thereafter: (i) sell, provide or engage in, any risk management solution or service (including, without limitation, List Screening Solutions and Order Screening Solutions) to, or for the benefit of, any DM Company, including any Persons that were customers or clients of any RiskWise Party prior to the Effective Date, or (ii) enter into any arrangement, agreement or commitment to provide any such solutions or services, directly or indirectly, to any DM Company.” (Emphasis added.)
Section 1.1 of the Master Agreement defines “affiliate” as “any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.” Additionally, the Master Agreement contains an exclusive jurisdiction and forum selection clause (“no suit or action for breach of this Agreement shall be brought unless instituted and maintained in any state or federal court of competent jurisdiction in New York County, State of New York” [Master Agreement § 17.16]).
Concurrent with the execution of the Master Agreement on June 30, 1999, a second agreement was executed by RiskWise and TCI (the TCI Operating Agreement). Under the TCI Operating Agreement, RiskWise made a capital contribution of $500,000 to TCI, and, in return, RiskWise became the holder of a membership interest in TCI and obtained the opportunity to increase that equity position at a later date.
In May 2000, Reed Elsevier, through its Lexis-Nexis Group Division (Nexis), acquired 100% of the stock of RiskWise. Nexis *758 announced in a press release that RiskWise “will operate, along with Nexis public records business, as Nexis RiskWise, a division of Nexis.” According to TCI, Reed Elsevier was aware of the terms of the Master Agreement at the time it purchased RiskWise. TCI claims that Reed Elsevier then began to use its large sales and marketing force to promote the sale of Risk-Wise products to customers, including DM companies. Specifically, TCI claims that an August 2000 audit revealed that Risk-Wise was violating the Master Agreement by, inter alia, selling risk management services to several DM companies, including the direct computer retailers Gateway, Inc. and Dell Computer Corp., and the direct credit card merchants Capital One Financial Corp. and First USA Bank N.A.[2] TCI further alleges that, after the acquisition, Reed Elsevier integrated its Nexis’s sales force with RiskWise’s sales force with respect to the sale and marketing of risk management services and products.
On November 11, 2000, TCI commenced this action against RiskWise and its preacquisition affiliates, claiming that Risk-Wise’s sales to DM companies breached section 2.6 (g) of the Master Agreement, and that defendants also breached the provisions of the Master Agreement pertaining to confidentiality and debt collection.[3]
On January 23, 2001, TCI sought leave to amend the complaint to add claims against Reed Elsevier. Leave to amend was granted. In the amended complaint, TCI advances two causes of action against Reed Elsevier. The first is for breach of contract. TCI states that Reed Elsevier, through Nexis, breached the noncompete provision in section 2.6 (g) of the Master Agreement by selling and providing risk management solutions and/or services to, or for the benefit of, customers prohibited under the Master Agreement. TCI alternatively asserts a cause of action against Reed Elsevier for unjust enrichment, based on profits Reed Elsevier allegedly received from its sale of risk management products to DM companies. An answer, asserting counterclaims under the Master Agreement and the TCI Operating Agreement, was interposed by RiskWise.
*759 Motion to Dismiss
In support of the motion to dismiss, Reed Elsevier claims that it cannot be bound by the Master Agreement because it had nothing to do with it, did not sign it, and was a total stranger to the Master Agreement, and, moreover, never agreed to assume, or be assigned, the liabilities of the seller. It thus argues that it cannot be liable for the alleged breach of the noncompete provisions of the Master Agreement. Reed Elsevier also contends that it is not bound by the Master Agreement because it was given no consideration therefor.
In considering the sufficiency of a pleading subject to a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), the court must determine whether, “ ‘accepting as true the factual averments of the complaint, plaintiff can succeed upon any reasonable view of the facts stated’ ” (Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 318 [1995] [citation omitted]; see also, Guggenheimer v Ginzburg, 43 NY2d 268 [1977]). The court is “required to accord plaintiffs the benefit of all favorable inferences which may be drawn from their pleading, without expressing [its] opinion as to whether they can ultimately establish the truth of their allegations before the trier of fact” (Campaign for Fiscal Equity v State of New York, supra, 86 NY2d at 318). The court must accept each allegation and all reasonable inferences therefrom as true, and, if the plaintiff is entitled to recovery based upon any reasonable view of the stated facts, the complaint is sufficient (219 Broadway Corp. v Alexander’s, Inc., 46 NY2d 506 [1979]; McGill v Parker, 179 AD2d 98 [1st Dept 1992]).
Reed Elsevier contends that, since it was not a party to the Master Agreement, it cannot be held to its terms, including the noncompete provision contained in section 2.6 (g) thereof. As the purchaser of RiskWise’s shares, Reed Elsevier relies on the well-established line of cases which provides that parent and subsidiary or affiliated corporations are treated separately and independently and will not be held liable for the contractual obligation of the other, unless there is a showing of complete, veil piercing dominion and control with respect to the transaction at issue (see, Alexander & Alexander of N.Y. v Fritzen, 114 AD2d 814, 815-816 [1st Dept 1985], affd on other grounds 68 NY2d 968 [1986]; Gulf & W. Corp. v New York Times Co., 81 AD2d 772, 773 [1st Dept 1981]).
TCI, however, argues that the provisions of the Master Agreement are applicable to Reed Elsevier because it is an “affiliate” of the RiskWise parties as defined in section 1.1 of the *760 Master Agreement. TCI alleges that Reed Elsevier is bound by, and in breach of, the Master Agreement since: (a) the Master Agreement clearly forbids RiskWise and its affiliates from selling RiskWise products to DM companies; (b) the Master Agreement defines an “affiliate” as any entity that “controls” or is “under common control” with RiskWise; (c) Reed Elsevier, through Nexis, owns and controls all of RiskWise and is, therefore, an affiliate; and (d) Reed Elsevier has chosen to intertwine the business of its division Nexis with that of Risk-Wise, and is selling RiskWise products to DM companies.
Reed Elsevier claims that an affiliated party is not bound, even where, as alleged here, a noncompete restrictive covenant purports to bind both the contracting party and its affiliates (Thomson-CSF, S.A. v American Arbitration Assn., 64 F3d 773 [2d Cir 1995]). Thomson concerned the applicability of an agreement to arbitrate executed by a subsidiary corporation to its parent corporation. In Thomson, it was held that, notwithstanding an “affiliate” clause, a parent nonsignatory corporation had not assumed the obligation contained in an agreement between its subsidiary and a supplier to arbitrate disputes with the supplier. However, outside the arbitration context, a number of cases support TCI’s contention that a nonsignatory entity may, by virtue of its subsequent creation or acquisition of a signatory to an agreement, be considered an “affiliate” within the meaning of the agreement, and be bound by the noncompete provision contained therein (see, Goodman Mfg. Co. v Raytheon Co., 1999 WL 681382, 1999 US Dist LEXIS 13418 [SD NY 1999]; see also, Conn Aire v J.C. Leasing, 921 F2d 276 [table], published in full at 1990 WL 209580, 1990 US App LEXIS 22363 [6th Cir 1990]; Citibank [S.D.] v Federal Deposit Ins. Corp., 857 F Supp 976 [D DC 1994]; Universal Studios v Viacom Inc., 705 A2d 579, 583 [Del Ch 1997]; Dorff, Selling the Same Asset Twice: Towards a New Exception to Corporate Successor Liability Rules, 73 Temp L Rev 717 [2000]). Based on a review of the amended complaint and the parties’ submissions, and applying the standard applicable on a motion to dismiss, the court holds that TCI has satisfactorily alleged a cause of action for breach of contract against Reed Elsevier.
In so holding, the court also rejects Reed Elsevier’s assertion that the claims against it must be dismissed because no consideration flowed directly to Reed Elsevier under the Master Agreement, because TCI has satisfactorily alleged that Reed Elsevier’s affiliate, RiskWise, received ample consideration for *761 the Master Agreement, including an equity investment in TCI. The cause of action for unjust enrichment is likewise adequately stated. New York courts permit litigants to plead breaches of contract and unjust enrichment in the alternative (see e.g., Nakamura v Fujii, 253 AD2d 387, 390 [1st Dept 1998]).
Motion to Disqualify Counsel
TCI moves to disqualify Proskauer from representing defendants. The court notes that Proskauer initially appeared in this action, on behalf of Reed Elsevier, in January 2001, and, on September 10, 2001, Proskauer appeared as cocounsel (together with Oppenheimer Wolff & Donnelly LLP), for the RiskWise defendants. TCI brought this motion for disqualification on November 21, 2001.
In support of the motion, TCI submits a moving and a reply affidavit from Rupinder Sidhu, sworn to November 21, 2001 and January 8, 2002, respectively. Sidhu, who is “a founder, manager, and (directly and through affiliates) the majority shareholder of [TCI],” states that Proskauer has been his lawyer since 1997 on matters ranging from personal tax and estate planning to business matters and investments, and for which Proskauer was paid fees exceeding $100,000. One of these business matters upon which Sidhu sought Proskauer’s advice concerned his investment in TCI, and the entity which preceded TCI, Alkade LLC (Alkade). According to Sidhu, the services rendered by Proskauer involved protecting and preserving Sidhu’s financial and other interests in connection with his investment in TCI, including, but not limited to: (a) negotiating the purchase agreement for Alkade; (b) negotiating a senior loan by Sidhu to TCI; (c) negotiating and drafting a prior version of what was thereafter executed as the TCI Operating Agreement between and among TCI and its members, and which is at issue in this litigation. Sidhu alleges that a significant portion of the work that the law firm performed for him with respect to Alkade involved negotiating and drafting an operating agreement, and that the claims which are now being asserted against TCI by defendants are based upon a finalized version of that earlier agreement.
Sidhu also alleges that he has never received any document, nor had any conversation with a lawyer from Proskauer in which he was informed that his attorney-client relationship with the law firm had been or was being terminated. He claims only that he sought and received the firm’s legal services *762 numerous times on numerous subject matters on an ongoing basis over the course of four years, and paid over $100,000 in fees.
In a March 2, 2001 letter, TCI’s counsel questioned whether, given Proskauer’s past (and present) representation of Sidhu, its representation of Reed Elsevier in this action created a conflict of interest. Proskauer (Charles S. Sims, Esq.), by letter dated March 8, 2001, denied that there was a conflict of interest, stating:
“Your letter is correct in asserting that Rupinder Sidhu has been, and at present is listed as, a client of this firm. However, contrary to the implication of your letter, that representation has concerned almost exclusively personal planning matters, as well as limited advice to Mr. Sidhu concerning the original operating agreement dated January 6, 1998. None of the advice concerned the [TCI] Operating Agreement * * * .
“After due consideration, we have concluded that this firm’s representation of Reed Elsevier in this matter is not adverse to a present client and is not on matters substantially related to past advice rendered to Mr. Sidhu. Nor does this firm have any confidential information concerning the [TCI] Operating Agreement.”
By letter, dated October 25, 2001, TCI’s attorney wrote to counsel at Proskauer, stating that Sidhu and TCI objected to Proskauer’s continued participation as counsel to Reed Elsevier or any of the RiskWise defendants, and asked the firm to withdraw as counsel. TCI’s counsel maintained that Proskauer has a conflict of interest which prevents it from representing the defendants herein.
Proskauer responded, in a letter, dated October 31, 2001, wherein it reiterated its position that: (a) the law firm’s representation of Reed Elsevier and the RiskWise parties is not adverse to any present client and does not involve matters substantially related to services previously provided to Sidhu; and (b) any corporate work it performed on behalf of Sidhu relating to Alkade is unrelated to the drafting of the TCI Operating Agreement, or any other work for TCI.
The court additionally notes that, in July 2001, Sidhu requested legal advice from Proskauer on an estate planning matter. Proskauer refused to provide services to Sidhu unless he signed a letter consenting to the law firm’s representation of *763 Reed Elsevier and RiskWise in the litigation against TCI, and waiving any conflict of interest with regard thereto. Sidhu did not sign this letter.
Also, in October 2001, RiskWise (represented by Proskauer) issued a request to TCI and its managers (including Sidhu) seeking to inspect certain TCI business records, pursuant to section 18-305 of the Delaware Limited Liability Company Act. Proskauer points out that TCI did not formally move to disqualify until late November 2001, after TCI participated in the Delaware proceeding and conducted discovery in this action, without formally objecting to Proskauer’s representation of defendants.
A review of the evidence, including the affirmations submitted by various Proskauer partners, shows that Proskauer does not dispute most of Sidhu’s factual allegations. Proskauer minimizes, however, the significance of the facts and the scope of the parties’ attorney-client relationship. For example, one of its partners affirms that his firm worked on drafting and revising the operating agreement for Alkade. The partner, however, reports that the engagement was terminated in February 1999, when Sidhu informed Proskauer that he had hired another law firm to work on that matter. In any event, Proskauer contends that the draft operating agreement it prepared for Alkade bears no similarity to, and is not the same document as, the TCI Operating Agreement.
TCI claims an order disqualifying Proskauer from further representing defendants herein is warranted, pursuant to CPLR 2214 and Code of Professional Responsibility DR 5-105[4] and DR 5-108.[5] TCI claims that three basic tenets governing lawyers are implicated here: first, a law firm cannot sue its current client; second, a law firm cannot drop a current client instantly in order to sue the client on behalf of another client; and third, a law firm cannot sue a former client on matters substantially related to the law firm’s prior representation of the client. Defendants, however, argue that disqualification is unwarranted, because: (a) Sidhu is not and has not been a “current” client of Proskauer at any time during Proskauer’s representation of defendants herein because Proskauer had no “current” engagement with Sidhu and was performing no services for him in January 2001, when the firm was engaged to appear in this action; (b) there is no substantial relationship *764 between, the issues in this litigation and the subject matter of Proskauer’s prior representation of Sidhu; and (c) TCI’s attempt to disqualify Proskauer is nothing more than a blatant tactical effort to deprive defendants of their choice of counsel.
Pursuant to Disciplinary Rule 5-105, a law firm cannot sue, or threaten to sue, a current client. Thus: “A law firm may not represent one client in litigation against another client (see, Cinema 5 v Cinerama, Inc., 528 F2d 1384, 1386 [2d Cir 1976]; Greene v Greene, 47 NY2d 447, 451 [1979]; Code of Professional Responsibility DR 5-105 [A], [B] [22 NYCRR 1200.24 (a), (b)]; EC 5-1, 5-14, 5-15 [‘(a) lawyer should never represent in litigation multiple clients with differing interests’]).” (Abbondanza v Siegel, 209 AD2d 1023, 1024 [4th Dept 1994]; see also, Dolgoff v Projectavision, Inc., 235 AD2d 311, 312 [1st Dept 1997]).
TCI contends that Sidhu is a current client of Proskauer, and is therefore owed an undivided duty of loyalty by Proskauer. TCI thus submits that Proskauer may not represent a party adverse to Sidhu, or adverse to TCI, the entity in which Sidhu is a manager and majority shareholder.
The court concludes that Proskauer did have a current attorney-client relationship with Sidhu when it was engaged to appear for defendants herein, based on the following undisputed facts: (a) Proskauer represented Sidhu on an ongoing basis for four years, providing legal services as recently as December 2000, a month after this litigation began, and a few weeks before the law firm was retained by Reed Elsevier herein; (b) Proskauer advised Sidhu on various matters, including his investment in TCI (formerly known as Alkade), the venture that is now the subject of this lawsuit; (c) Proskauer collected over $100,000 in fees and disbursements from Sidhu for legal services rendered, and part of these fees was paid by TCI; (d) Proskauer never sent any writing to Sidhu purporting to terminate their attorney-client relationship; and (e) in September 2001, Proskauer appeared as cocounsel for Risk-Wise, which is asserting counterclaims based in part upon the TCI Operating Agreement — which is an amended version of the same agreement worked upon by Proskauer on behalf of Sidhu.
The intermittent “as needed” nature of the legal advice Proskauer rendered over the course of its relationship with Sidhu does not release the firm from that duty of loyalty (see, Abbondanza v Siegel, supra [finding ongoing attorney-client relationship for disqualification purposes based on sporadic *765 advice and nonlegal, fiduciary services rendered over 25-year period]). In light of the nature of the relationship between Proskauer and Sidhu, the mere fact that Sidhu had no open matters with Proskauer, and that Proskauer was performing no services for Sidhu, in January 2001, does not, without more, refute Sidhu’s showing that he had an ongoing attorney-client relationship with Proskauer in January 2001.
Disciplinary Rule 5-108 (a) (1) (22 NYCRR 1200.27 [a] [1]) requires disqualification where a lawyer who has represented a former client “represent[s] another person in the same or a substantially related matter in which that person’s interests are materially adverse to the interests of the former client” (see, Solow v Grace & Co., 83 NY2d 303 [1994]; Dolgoff v Projectavision, Inc., supra; see also, Mitchell v Metropolitan Life Ins. Co., 2002 WL 441194, 2002 US Dist LEXIS 4675 [SD NY 2002]).
TCI submits that, even if Sidhu was not Proskauer’s “current” client, disqualification is required because the work done by Proskauer for Sidhu, pertaining to his financial and other interests in connection with the Alkade/TCI business venture, is substantially related to this litigation.
Proskauer contends that its representation of defendants in this action is not the same as, or substantially related to, any representation Proskauer previously provided to Sidhu. Proskauer further asserts that the Alkade agreement and the TCI Operating Agreement are completely different and unrelated documents, and that the Alkade agreement has nothing to do with RiskWise or the matters in issue in this action.
Upon review, it is clear that, although this litigation involves primarily claims under the Master Agreement, the Master Agreement and the TCI Operating Agreement are closely intertwined. Both of these agreements are at issue herein. While Proskauer maintains that the version of the agreement which they prepared in February 1999 was not the final version of the TCI Operating Agreement, this does not change the essential nature of the work performed. Proskauer was representing Sidhu’s interests in connection with, and was charged with protecting, all aspects of his investment in Alkade/TCI (see e.g., Tekni-Plex, Inc. v Meyner & Landis, 89 NY2d 123, 134-135 [1996] [when a law firm provides legal advice during the negotiation of agreement, and later sues that client in litigation involving the same agreement, the substantial relationship between the two matters is clear]).
*766 Accordingly, the court holds that Proskauer’s representation of Sidhu involved matters that are substantially related to the issues in this action.
Disqualification motions are carefully scrutinized because they seek to deny a party’s right to representation by the attorney of his choice and thereby limit a “valued right” of the party (S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp., 69 NY2d 437, 443 [1987]).
Proskauer argues that this disqualification motion is a litigation tactic intended to deprive defendants of their choice of counsel. In this regard, Proskauer points out that TCI’s counsel raised this purported conflict issue in March 2001, but did not move to disqualify until November 2001, having in the interim participated in discovery in this action and having participated in the Delaware proceeding (see, S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp., supra; Matter of Nomura Sec. Intl. v Hu, 240 AD2d 249 [1st Dept 1997]).
The court disagrees with Proskauer’s claim that this motion is an impermissible litigation tactic and/or that TCI has somehow waived its right to seek disqualification based either on its alleged delay in failing to promptly move to disqualify or based on its participation in proceedings herein and in the State of Delaware.
It cannot be said that TCI unreasonably delayed seeking disqualification. When Sidhu first discovered that Proskauer was representing Reed Elsevier, in March 2001, his attorneys immediately brought this matter to Proskauer’s attention. TCI, however, did not bring the motion to disqualify at that time, because, among other things: (a) at that time, Proskauer represented Reed Elsevier only; (b) RiskWise was represented exclusively by separate counsel; and (c) defendants had not asserted or threatened to assert any claims against Sidhu personally. These facts changed in September 2001, when, among other things: (a) Proskauer served a notice announcing that it was appearing as counsel for RiskWise as well as Reed Elsevier herein, and (b) defendants threatened, or at least insinuated, that they were threatening to assert claims directly against Sidhu (see, e.g., letter dated Sept. 26, 2001 from Risk-Wise to TCI’s president and to Sidhu). Moreover, the special proceeding in the State of Delaware sought only the limited relief of access to a company’s books and records — it involved no claims for other legal or equitable relief. Viewed in this time frame, it cannot be said that there was any undue delay by TCI in making this motion.
*767 Even if it could be said that there was delay, the delay was not lengthy, the motion was not made on the “eve of trial,” and there has been no showing of prejudice to defendants (see, Alicea v Bencivenga, 270 AD2d 125, 126 [1st Dept 2000]). Thus, in Alicea v Bencivenga (supra, at 126), the First Department granted disqualification, stating: “As the motion to disqualify was not made on the eve of trial, the delay in moving is not a bar to the relief sought, particularly where the conflict is so clear (see, Natiello v Natiello, 209 AD2d 389 [2d Dept 1994]).”
Conclusion
It is ordered that defendant Reed Elsevier’s motion to dismiss the amended complaint as against it is denied; and it is further ordered that TCI’s motion to disqualify Proskauer from acting as cocounsel or counsel for defendants herein is granted.

. By letter dated October 19, 2001, Reed Elsevier withdrew the portion of motion sequence number 007 seeking dismissal of the amended complaint on the ground of “prior action pending” (i.e., the action entitled Reed Elsevier v Credit Index, Case No. C-3-00 591, US Dist Ct, SD Ohio, W Div-Dayton). According to defendants’ counsel, that action (which, in any event was commenced after this action was begun) was dismissed due to lack of diversity jurisdiction.

. TCI contends that each of these companies fall within the definition of a “DM company” under the Master Agreement because each sells a substantial portion of its products or services through catalogs, mail order, print advertisements, circulars, telemarketing and/or television.

. The court denied TCI’s motion for a preliminary injunction and the First Department affirmed.

. 22 NYCRR 1200.24 (a).

. 22 NYCRR 1200.27 (a) (1).